BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: ROBLOX CHILD SEXUAL EXPLOITATION/ASSAULT LITIGATION | MDL Docket No. |

**MEMORANDUM IN SUPPORT OF MOTION FOR TRANSFER OF ACTIONS UNDER 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

Under 28 U.S.C. § 1407 and Rule 6.2 of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation, Minor Plaintiff Jane Doe ("Movant" or "Jane")[1] submits this memorandum in support of her motion for transfer and consolidation of all actions identified in the Schedule of Actions, as well as any cases subsequently filed involving similar common questions of fact, to the United States District Court for the Northern District of California.

Transfer of these cases is well within the scope of 28 U.S.C. § 1407(a): (1) the actions involve common questions of fact, (2) consolidation would serve the convenience of the parties and witnesses, and (3) consolidation would promote the just and efficient conduct of this litigation.

**BACKGROUND**

Defendant Roblox Corporation has sparked an online child sexual exploitation and assault epidemic in this country. Each day, countless children are groomed and sexually exploited or assaulted by child predators using online applications that provide easy access to children.[2] It is

---

[1] Jane is the plaintiff in the action, *John Doe, as next friend of minor plaintiff, Jane Doe v. Roblox Corporation and Discord Inc.*, No. 25-cv-05753-JSC (N.D. Cal.). *See* Ex. A-7.

[2] Hearing Before the U.S. House Subcommittee on Commerce, Manufacturing, and Trade, "The World Wild Web: Examining Harms Online," Testimony of Yiota Souras, Chief Legal Officer for National Center for Missing & Exploited Children (Mar. 26, 2025) ("The epidemic of child exploitation online is not abating.").

1

Roblox's app, marketed to kids with an open and easy portal for predators, that fuels this crisis.

Roblox owns, operates, designs, markets, and distributes the eponymous gaming app, "Roblox," which it describes as the "#1 gaming site for kids and teens."[3] Roblox exploded in popularity during the pandemic when the company promoted the app as a way that kids stuck at home could safely play, explore, and connect with other children online. That growth spurred the company to go public in 2021, and its market capitalization is currently around $90 billion.

While Roblox promotes itself as a gaming app for kids, it is in fact easily accessible to children and adults alike. A person of any age can create an account simply by entering a birthdate of their choosing (real or otherwise), a username, and a password. In Roblox's 2024 Annual Report, the company reported an average of 82.9 million daily active users.[4]

Roblox's success is based in part on its constant assurances to parents that its app is safe for children. Roblox extensively touts the effectiveness of its parental controls and other safety features. "Safety is in our DNA," according to Roblox.[5] As Roblox's Chief Safety Officer Matt Kaufman boasts on the company's website, Roblox is "one of the safest online environments for our users, particularly the youngest users."[6]

In reality, with its purportedly child-friendly app, Roblox has created a powerful tool for child sex predators. As detailed in Jane's complaint, Roblox allows predators to misrepresent their ages, masquerade as children, and then use the app's "experiences" and messaging features to find, "befriend," and gain the trust of young players. The app's wildly popular online currency,

---

[3] Ex. A-7, Compl. ¶ 21.

[4] Roblox Corporation 2025 Proxy Statement and 2024 Annual Report (May 29, 2025), https://s27.q4cdn.com/984876518/files/doc_financials/2024/ar/Roblox-2025-Proxy_2024-AR-1-1.pdf.

[5] Ex. A-7, Compl. ¶ 38.

[6] Ex. A-7, Compl. ¶ 49.

2

"Robux," also provides an insidious means for grooming. Predators promise and gift various amounts of this coveted currency to curry favor with kids and persuade them to provide information about themselves and, worse, sexually explicit images and videos of themselves.

In many cases, predators also use Roblox to lure kids into communicating on messaging apps that offer encrypted or ephemeral messaging. For years, Roblox has known that predators often "transfer" children to apps like Discord where encryption technology can easily conceal interactions that include sexually explicit images and videos, pressure on kids to meet in person, or threats to a child's safety. Nonetheless, Roblox inexplicably continues to allow users to share links to their Discord accounts. In other cases, predators direct their child victims to apps like Snapchat or Instagram, the risks of which Roblox has also long been aware.

That is precisely what happened to Jane. An adult predator used Roblox to identify and target her when she was just 13 years old. Roblox allowed this predator to pretend he was a kid like Jane, and then groom and manipulate her to capture her trust. The predator then seamlessly transitioned their interactions to Discord, where he escalated his predation by sending Jane sexually explicit images of himself and using Robux to coerce her into continuing to interact with him. The predator ultimately convinced Jane to meet him in person near her home. When Jane arrived, the predator attempted to rape her.  Fortunately, law enforcement intervened and arrested him. Jane's life has been devastated by this experience. She has engaged in self-harming behaviors and was twice hospitalized for psychiatric treatment. She has been diagnosed with post-traumatic stress disorder, anxiety, and depression. She will never be the same child she once was.

Sadly, Jane's case is no outlier. It is only the tip of the iceberg. There are currently at least 31 similar cases pending against Roblox in 12 judicial districts before 25 different judges. Of these 31 cases against Roblox, 13 cases, like Jane's, also include Discord as a defendant. Four of

the cases name Roblox and Snap Inc., which operates the app Snapchat, and one case names Roblox and Meta Platforms, Inc., which operates the app Instagram. Movant's counsel is aware of hundreds of similar cases against Roblox that are still being investigated and anticipates that thousands of cases may be filed.

*Plaintiffs.* The plaintiffs in the Actions are all minors who were sexually abused or exploited by child sex predators, or adults who suffered the same trauma when they were minors. These predators all used Roblox to find, target, and groom plaintiffs before coercing them into exchanging sexually explicit images or meeting in person. In most cases, the predators also used Discord, Snapchat, or Instagram to communicate with and abuse their targets. In many cases, the injury that plaintiffs suffered include actual or attempted in-person assault.

*Defendants*. Roblox Corporation is a Nevada corporation with its principal place of business in San Mateo, California. As described above, Roblox owns, operates, designs, markets, and distributes the children's gaming app Roblox. It was founded by David Baszucki and Eric Cassel in 2006 and launched its virtual currency, Robux, in 2007. Users purchase Robux with real money and use it to buy in-game items such as clothing, accessories, gear, and avatar upgrades. Developers and creators of Roblox games can then take Robux and convert them back to real money, and Roblox takes a percentage of the revenue. Roblox has no age minimum, and it is extremely easy for children of any age to create an account, with or without their parents' approval. Roblox also permits adults to create accounts with no age or identity verification, permitting them to pose as minors on the app. In March 2021, Roblox went public and was valued at $41.9 billion.

Discord Inc. is a Delaware corporation with its principal place of business in San Francisco, California. It owns, operates, designs, markets, and distributes Discord—an app that allows users to communicate over voice, video, and text messaging. Discord extensively markets its app to

young users. It attracts young users by offering features such as "Student Hubs" and custom emojis. While Discord claims to prohibit users under 13 years old from using its app, it does not verify age or identity, and the app is overrun with children under 13.

Snap Inc. is a Delaware corporation with its principal place of business in Santa Monica, California. It owns, operates, designs, markets, and distributes Snapchat—an app that allows users to receive photos and short videos and track other users' locations. Snapchat's hallmark feature is ephemeral messaging, which is reflected in its ghost logo. In 2023, Snap reported that 90% of 13–24-year-olds in the United States were using Snapchat. Snap has deliberately targeted this population, boasting to advertisers that "Snapchat Works for Gen Z" and that it "delivers on the emotions that Gen Z seeks and it does so consistently across the platform."[7] While Snap claims to prohibit children under 13 years old from using its platform, it does not verify age or identity. In 2023, researchers estimated that Snapchat had 2.9 million users under the age of 13 in the United States.

Meta Platforms, Inc. is a Delaware corporation with its principal place of business in Menlo Park, California. It owns, operates, designs, markets, and distributes Instagram—an app that allows users to post photos and videos, follow accounts, interact with others' posts, and send private messages to other users via voice, video, photos, and text. Teenagers are the lifeblood of Instagram, which is no accident. Meta designed and markets Instagram to appeal to teenagers and maximize their time on the app. Instagram claims to require users to be at least 13 years old to use the app, but it does not verify age or identity, and so underage users proliferate on Instagram.

The Actions are all in the early stages of litigation. To Movant's counsel's knowledge, no scheduling orders have been entered, no discovery has been conducted, and only limited motions

---

[7] Ex. A-2, Compl. ¶ 108.

have been filed. The parties in the Actions have been largely focused on negotiating schedules for briefing Defendants' anticipated motions to compel arbitration and motions to dismiss.

## ARGUMENT

**A. Transfer and Consolidation of the Actions Is Appropriate and Necessary.**

MDL consolidation of pretrial proceedings is appropriate if (1) actions pending in different federal courts involve "one or more common questions of fact," and (2) consolidation "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). Both elements are met here.

**1. The Actions Share Common Questions of Fact.**

The threshold requirement of § 1407 is that the Actions involve one or more common questions of fact. The Actions need not be identical: "Transfer under Section 1407 does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer." *In re Katz Interactive Call Processing Patent Litig.*, 481 F. Supp. 2d 1353, 1355 (J.P.M.L. 2007); *see also In re Soc. Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, 637 F. Supp. 3d 1377, 1378 (J.P.M.L. 2022) ("That individualized factual issues may arise in each action does not—especially at this early stage of litigation—negate the efficiencies to be gained by centralization."). Here, the Actions share numerous common factual issues.

The plaintiffs allege, nearly identically, that they were identified and targeted on Roblox by child predators who were able to use the app to impersonate children and groom and coerce the plaintiffs into sending sexually explicit images of themselves or into meeting in person. Even where the ultimate solicitation of explicit images or other criminal acts occurred on other apps—such as Discord, Snapchat, or Instagram—it was Roblox, with its defective design and inadequate safety features, that provided the predators with an easy access point and gateway to initially communicate with and gain the trust of their victims.

This common set of facts and circumstances gives rise to the nearly identical legal claims pled in the Actions—including fraud, negligence, design defect, and failure to warn. These claims present many common factual issues that make transfer and consolidation appropriate, including (1) Roblox's knowledge of the prevalence of child sexual exploitation and abuse by predators who use the company's app to identify, target, and groom children; (2) the veracity of and basis for Roblox's representations that the app is safe for children to use; (3) the reasonableness of Roblox's actions, such as Roblox's failure to implement effective parental controls and other safety features like age and identity verification that Roblox knew or should have known would prevent the sexual exploitation and abuse of children; (4) the reasonableness of the design of Roblox's app, which includes features that allow predators to easily access and interact with children; and (5) Roblox's warnings or lack thereof to children and their parents about the risks of sexual exploitation and abuse associated with children's use of the app. *See* Appendix (chart identifying factual contentions and legal claims in each case).

While the plaintiffs may differ in particular facts specific to their own exploitation and abuse, those differences are no impediment to consolidation, as the Panel has previously recognized. In *In re Uber Technologies, Inc.*, for example, the Panel rejected Uber's argument that centralization was inappropriate because of differences in "the various circumstances of plaintiffs' alleged assaults and their injuries," concluding that there were "sufficient common issues present to warrant centralized treatment." 699 F. Supp. 3d 1396, 1398 (J.P.M.L. 2023). As in *Uber*, common issues here include Roblox's "knowledge about the prevalence of sexual assault" facilitated by its app, its "representations regarding safety," and "whether [Roblox] failed to implement adequate safety measures." *Id.*; *see also Uber Techs., Inc. v. United States Jud. Panel on Multidistrict Litig.*, 131 F. 4th 661, 670 (9th Cir. 2025) (explaining that "corporate policies and

practices . . . present a common factual question . . . because all plaintiffs will no doubt seek discovery into what those policies were").

### 2. Transfer and Consolidation Will Serve the Convenience of the Parties and Witnesses and Promote the Just and Efficient Conduct of the Actions.

Consolidation is also appropriate here because it will serve "the convenience of parties and witnesses and will promote the just and efficient conduct of [the] actions." 28 U.S.C. § 1407(a). Specifically, transfer of the Actions will (a) avoid inconsistent pretrial rulings, (b) eliminate duplicative discovery, and (c) reduce litigation costs and save the time and effort of the parties, their counsel, and the courts. *See, e.g.*, Manual for Complex Litigation (Fourth) § 20.131 (2004); *In re McKinsey & Co., Inc., Nat'l Prescription Opiate Consultant Litig.*, 543 F. Supp. 3d 1377, 1379 (J.P.M.L. 2021).

#### a. Transfer Will Avoid Inconsistent Pretrial Rulings.

Consolidation will avoid inconsistent rulings on legal issues. *See In re Protegrity Corp. & Prointegrity USA, Inc., Patent Litig.*, 84 F. Supp. 3d 1380, 1381 (J.P.M.L. 2015) (stating that "centralization will eliminate the potential for inconsistent rulings on several pending motions to dismiss"). The Actions involve numerous common legal issues that present a serious risk of conflicting results if the cases are not transferred and consolidated.

These common legal issues are neither straightforward nor settled. For example, in response to any motions to compel arbitration by Roblox or the other defendants, the plaintiffs in most, if not all, of the Actions will assert that the arbitration agreements are unenforceable under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA"), 9 U.S.C. §§ 401-402. Enacted only in 2022, this landmark legislation empowers survivors like the plaintiffs to pursue their claims publicly in court, broadly barring enforcement of arbitration agreements in any case that "relates to" a "sexual assault" or "sexual harassment dispute." 9 U.S.C. § 402(a).

Roblox and the other defendants will also argue that the plaintiffs' claims are barred by Section 230 of the Communications Decency Act and by the First Amendment—defenses that raise complex and nuanced issues of federal and constitutional law that courts have not resolved uniformly. *See, e.g.*, *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 736 (9th Cir. 2024) (highlighting that "district courts have struggled to determine the outer limits of § 230(c)(1) immunity, partly because our own case law has yielded mixed results as to the application of that immunity").

Still another legal common legal issue on which courts have divided is whether apps like Roblox qualify as "products" such that the plaintiffs can assert product-liability claims. *See In re Soc. Media Adolescent Addiction/Personal Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 838-53 (N.D. Cal. 2023) (holding that social media apps are products with respect to certain features).

Consolidation also will "avoid inefficient and conflicting rulings on the scope of discovery, including as to which witnesses [are] to be deposed and under what circumstances, which ESI sources [are] to be searched, which search terms or other methods [are] to be used, and which documents [will] be produced." *Uber*, 131 F. 4th at 671.

Centralization is thus warranted because it will allow one court to resolve these and other common issues in the Actions consistently and efficiently. *See, e.g.*, *In re Soc. Media Adolescent Addiction*, 637 F. Supp. 3d at 1378 ("Centralization of all actions . . . will allow for efficient coordination of briefing and rulings on motions to dismiss . . . .").

### b. Transfer Will Eliminate Duplicative Discovery.

Because the Actions share the same basic theory of liability and underlying factual allegations and injuries, the plaintiffs will seek largely overlapping discovery on issues including, among others, (1) Roblox's knowledge of the sexual exploitation and abuse on its app; (2) the design of Roblox's app; (3) actual or considered changes to Roblox's app; and (4) warnings or other information that Roblox provided or considered providing minor users and their

9

parents/guardians on the safety of the app for minors. Thus, if the Actions continue to proceed separately in different courts, substantial duplicative discovery will occur.

Consolidation will eliminate, or at least mitigate substantially, this duplicative discovery. For example, it "will avoid repetitive depositions of [the defendants'] officers and employees and duplicative document discovery." *In re: Pilot Flying J Fuel Rebate Contract Litig. (No. 11)*, 11 F. Supp. 3d 1351, 1352 (J.P.M.L. 2014); *see also In re: Zyprexa Prods. Liab. Litig.*, 314 F. Supp. 2d 1380, 1382 (J.P.M.L. 2004) (emphasizing that "transfer under Section 1407 will offer the benefit of placing all actions in this docket before a single judge who can structure pretrial proceedings to consider all parties' legitimate discovery needs while ensuring that common parties and witnesses are not subjected to discovery demands that duplicate activity").

### c. Transfer Will Reduce Litigation Costs and Save the Time and Effort of the Parties, Their Counsel, and the Courts.

Consolidation will significantly reduce litigation costs and conserve the resources of the parties and the courts. It will enable a single federal court to establish a pretrial plan that will minimize the inconvenience and expense of litigating these cases individually. It will allow plaintiffs' counsel "to combine their forces and apportion the workload in order to streamline the efforts of the parties and witnesses, their counsel and the judiciary, thereby effectuating an overall savings of cost and a minimum of inconvenience to all concerned." *In re Baldwin-United Corp. Litig.*, 581 F. Supp. 739, 741 (J.P.M.L. 1984). As for the defendants, it will ensure that they can concentrate their discovery efforts in one court rather than across numerous district courts. And, given that there will be state court proceedings, having one coordinated federal court proceeding will streamline scheduling and other cross-jurisdiction issues.

### d. The Presence of Non-Roblox Defendants Does Not Undermine the Efficiency Benefits of Consolidation.

The inclusion of defendants other than Roblox in many of the Actions does not undermine consolidation, as the "transferee judge can address unique issues using separate discovery tracks for each defendant or platform and employ separate motion tracks, to the extent necessary." *In re Soc. Media Adolescent Addiction*, 637 F. Supp. 3d at 1378. In addition, the Actions involving other defendants also present common factual issues that will create similar potential for inconsistent pretrial rulings and inefficient duplication of work if transfer is denied. For example, in addition to Jane's case, 13 of the other Actions name Discord as an additional defendant, and these cases all involve substantially the same facts, circumstances, and legal claims with respect to Discord. And the cases that name Snap or Meta as additional defendants assert the same legal claims against these defendants that are asserted against Roblox and challenge similar features, such as ineffective parental controls and lack of age and identity verification.

More fundamentally, each of the Actions alleges that a minor was connected to a predator on Roblox and, in many cases, that the interactions and abuse then spread to another app. Roblox is the alleged common thread and root cause. Roblox is the starting point for discovery and liability in all of the cases. This "common factual core warrants centralization despite the involvement of a number of different defendants." *In re: FTX Cryptocurrency Exchange Collapse Litig.*, 677 F. Supp. 3d 1379, 1381 (J.P.M.L. 2023); *see also In re January 2021 Short Squeeze Trading Litig.*, MDL No. 2989, 2021 U.S. Dist. LEXIS 63656, at *6 (J.P.M.L. 2021) (centralizing actions "nam[ing] more than forty brokers, funds, and clearinghouses as defendants" where all actions involved common conduct concerning the Robinhood trading platform).

**B. The Northern District of California Is the Most Suitable Forum for this MDL.**

Movant respectfully submits that the Panel should centralize these cases in the Northern District of California. In selecting the appropriate transferee district, the Panel generally considers (1) the location of parties, witnesses, and documents; (2) where the cases have been filed; and (3) the docket conditions of the potential transferee districts. *See, e.g.*, *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 363 F. Supp. 3d 1372, 1375 (J.P.M.L. 2019) (transferring to District of Maryland because "Marriott is headquartered in that district, and relevant documents and witnesses thus likely will be found there"); *In re Treasury Sec. Auction Antitrust Litig.*, 148 F. Supp. 3d 1360, 1361-62 (J.P.M.L. 2015) (transferring to Southern District of New York because nearly all defendants were headquartered there and because "the vast majority of actions" were pending in that district). These factors strongly favor the Northern District of California.

*First*, many of the parties, witnesses, and documents are located in the Northern District of California. Roblox is headquartered in that district, as are Discord and Meta. (Snap is not far away, headquartered in Santa Monica, California.) Discovery would thus be centered in the Northern District of California and would be most convenient for the parties and witnesses. It is also a venue that can try cases without *Lexecon* issues—providing efficiencies for all parties in fashioning case management tools to resolve common questions.

*Second*, the Northern District of California currently has the most cases filed, by far. Considering the location of Roblox, it is not surprising that 19 of the 31 Actions have been filed in that district, including the first-filed case. *See, e.g.*, *In re PepsiCo, Inc., Bottled Water Mktg. & Sales Practices Litig.*, 560 F. Supp. 2d 1348, 1349 (J.P.M.L. 2008) (selecting a transferee district in part because two of four filed actions were already pending there); *In re Fosamax Prods. Liab. Litig.*, 444 F. Supp. 2d 1347, 1349-50 (J.P.M.L. 2006) (15 of 19 actions already pending in transferee district); *In re Air Crash near Peixoto De Azevada, Brazil on Sept. 29, 2006*, 493 F.

Supp. 2d 1374, 1375 (J.P.M.L. 2007) (transferring to district where first-filed cases were pending and where the actions were "more procedurally advanced than the actions pending elsewhere").

*Third*, the Northern District of California is adept at managing its docket. The district has 24 district judges, and last year had 9,275 cases filed and 10,686 terminated.[8] The district is also well-equipped to handle this litigation; it has extensive experience with MDLs but is not overtaxed with MDLs. While there are currently 15 active MDLs pending in the district,[9] the majority of these MDLs are mature and near completion. Moreover, the Northern District of California also has extensive experience coordinating federal cases with California state court cases, including Judicial Council Coordination Proceedings. At least three state court actions have been filed in California,[10] and more with plaintiffs residing in California will likely be filed soon. The state court actions assert factual allegations nearly identical to the federal court cases. As a result, transfer of the federal actions to the Northern District of California will promote coordination between the parallel state and federal cases. *See, e.g.*, *In re Avaulta Pelvic Support Sys. Prods. Liab. Litig.*, 746 F. Supp. 2d 1362, 1364 (J.P.M.L. 2010) (transferring to the Southern District of West Virginia because "centralization in this district will facilitate coordination with West Virginia state court actions").

---

[8] United States Courts, Statistical Tables for the Federal Judiciary, Table Number C-5, https://www.uscourts.gov/data-table-report-names/statistical-tables-federal-judiciary.

[9] U.S. District Court, Northern District of California, Active MDLs in the Northern District, https://cand.uscourts.gov/multidistrict_litigation/.

[10] *Dallas v. Roblox Corp.*, No. 25-629056 (Cal. Super. Ct., San Francisco Cty.); *Doe v. Roblox Corp.*, No. 25-CIV-05901 (Cal. Super. Ct., San Mateo, Cty.); *Doe v. Roblox Corp.*, No. 25-CIV-01193 (Cal. Super. Ct., San Mateo, Cty.).

*Finally*, the Northern District of California is home to numerous judges qualified to handle a complex MDL like this one. Movant submits that Judge William H. Orrick and Chief Judge Richard Seeborg are particularly well-suited for this MDL.

### 1. Judge William H. Orrick

Judge Orrick has served as a district court judge in the Northern District of California since 2013. During that time, he has developed extensive experience overseeing complex civil litigation involving minors and technology, including *In re: Juul Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation* (MDL 2913), which has been almost entirely resolved. In assigning the *Juul* MDL to Judge Orrick, the Panel emphasized that he is "an experienced transferee judge" and "[w]e are confident that he will steer this litigation on a prudent course." *In re Juul Labs, Inc.*, 396 F. Supp. 3d 1366, 1368 (J.P.M.L. 2019). Judge Orrick's exemplary handling of the *Juul* MDL, also a case involving a core, or gateway company defendant (Juul Labs, Inc.), as well as its partners and competitors, stands as a model of judicial leadership in a complex MDL, and he will be able to apply his experience managing this MDL to the similar substantive and procedural challenges that will arise here.

### 2. Chief Judge Richard Seeborg

Chief Judge Seeborg has served as a district court judge in the Northern District of California since 2010. During that time, he has overseen numerous complex civil cases, including two MDLs: *In re: Optical Disk Drive Products Antitrust Litigation* (MDL 2143) and *In re: Viagra (Sildenafil Citrate) Products Liability Litigation* (MDL 2691). That experience will be invaluable for handling this MDL. Chief Judge Seeborg is also well suited for this MDL because, as Chief Judge, he is afforded additional staff and can, if he chooses, take a reduced case load. The Desktop for Chief Judges of U.S. District Courts suggests one way that chief judges can manage or reduce their caseload is by taking "responsibility for only particular types of cases or matters." Federal

Judicial Center, *The Desktop for Chief Judges of U.S. District Courts* 45 (4th ed. 2014). For these reasons, Chief Judge Seeborg is well-positioned to ensure proper and efficient case management of this MDL and would have the resources to devote to this matter.

\*    \*    \*

As the Panel well knows, there are many experienced MDL judges in the Northern District of California who would aptly steer this litigation. This Court is particularly well-situated for this matter, as it will be trial venue for the vast majority of the cases—an unparalleled perk in resolving the myriad common questions presented.

Date:   September 18, 2025                                Respectfully submitted,

By: */s/ Alexandra M. Walsh*
Alexandra M. Walsh
**ANAPOL WEISS**
14 Ridge Square, NW, 3rd Floor
Washington, DC 20016
Telephone: (771) 224-8065
Facsimile: (215) 735-2211
awalsh@anapolweiss.com

By: */s/ Sarah London*
Sarah London
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
slondon@girardsharp.com

*Attorneys for Movant-Plaintiff*