**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: ROBLOX CHILD SEXUAL PREDATION LITIGATION | MDL Docket No. 3166 |

**PLAINTIFF JANE DOE G.C.[1], AS GUARDIAN AND NEXT FRIEND OF MINOR PLAINTIFF, JANE DOE A.C.'S INTERESTED PARTY RESPONSE TO MOTION FOR TRANSFER OF ACTIONS UNDER 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

Pursuant to 28 U.S.C. § 1407 and Rule 6.2(e) of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation, Interested Party Plaintiff Jane Doe G.C. ("Interested Party" or "Jane Doe G.C."), as guardian and next friend of minor plaintiff, Jane Doe A.C. ("Jane Doe A.C.") respectfully submits this brief in support of Motion For Transfer Of Actions Under 28 U.S.C. § 1407 For Coordinated Or Consolidated Pretrial Proceedings.

Interested Parties request all actions identified in the Schedule of Actions, as well as any cases thereafter filed involving similar common questions of fact be transferred to Judge Stephen Rogers Bough ("Judge Bough") of the United States District Court for the Western District of Missouri or alternatively, to Judge William H. Orrick ("Judge Orrick") of the Northern District of California for the reasons stated herein.

I.     **BACKGROUND**

Similar to the plaintiffs in the other cases for which transfer and consolidation is requested, Interested Parties Jane Doe G.C. and Jane Doe A.C. have suffered personal injury from use of

---

[1] *See Jane Doe G.C, et al v. Roblox Corporation*, Case No. 4:25-CV-01402 (E.D. Mo. Filed 9/17/2025). Judge Sippel was assigned to this case in Missouri after the Schedule of Actions was filed.

Defendant's app product, Roblox.   Interested Parties' case was filed in the Eastern District of Missouri federal court on September 17, 2025 and is currently before Judge Rodney W. Sippel.

Jane Doe A.C., is a 13-year-old girl who at all relevant times was an innocent, naïve and highly vulnerable yet avid user of Defendant's app, Roblox. Jane Doe A.C. relied heavily on the app for entertainment and social interaction with other children. This made the young girl a prime target for the countless child predators Defendant knew freely roamed the app looking for unsuspecting and trusting children.  Jane Doe A.C. suffered injury after being specifically targeted by a predator who, after capturing her trust on Defendant's app, Roblox, transitioned their interactions to text messages at which point the predator sent Jane Doe A.C. sexually explicit images of himself and sexually graphic messages.  As the predator's grooming continued, the predator also convinced Jane Doe A.C. to send him sexually explicit images of herself in return.

For  years, Defendant knew its app product, Roblox, was dangerous and harmful to children and teenagers but actively concealed these facts from the general public and government regulators.   Defendant failed to warn parents about known harms merely to boost its own economic gain. Interested parties now seek to hold Defendant responsible for its defectively designed app product which it knowingly specifically marketed to minor children without adequate warnings and safeguards that would have minimized the risk of serious harm to children including but not limited to being victimized by sexual abuse and predation on and off line.

## II.    ARGUMENT

### A.    Transfer and Coordination are Appropriate

Plaintiffs concur, join and adopt arguments of Movant that an MDL should be created in this product liability litigation. The related actions assert the same or similar claims based on multiple common factual allegations and will involve common legal theories. Consolidated or

coordinated pretrial treatment under Section 1407 will assist the parties and the courts in avoiding duplicative rulings on the common issues in dispute and will also serve the convenience of the parties and witnesses and promote the just and efficient resolution of the litigation.

### B.     Western District of Missouri (Judge Bough) as Most Suitable MDL Transferee Court for This Complex Product Liability MDL

The Western District of Missouri federal court in Kansas City, Missouri, where Judge Bough has presided since 2014, is the most appropriate transferee venue for this product liability MDL for several reasons.

Judge Bough just completed MDL 2936, *IN RE: Smitty's/CAM2 303 Tractor Hydraulic Fluid Marketing, Sales Practices, and Products Liability Litigation* (MDL 2936). MDL 2936 began in 2021 and settled/closed on April 2, 2025.[2] Similar to Movant's, Interested Party and the Related Actions, where product liability theories are alleged against Roblox and Discord, MDL 2936 was a complex product liability MDL/putative class action. MDL 2936 addressed the manufacture, labeling, marketing, and performance of 303 tractor hydraulic fluid. MDL 2936 Plaintiff's alleged, *inter alia*, product liability theories of (1) negligence; (2) breach of express warranty; (3) breach of implied warranty of merchantability; (4) breach of implied warranty of fitness for particular purpose; (5) unjust enrichment; (6) fraudulent misrepresentation; (7) negligent misrepresentation; and (8) violations of the various state deceptive practices acts.

Having just *completed* a product liability MDL, Judge Bough is likely to already have resources in place to effectively and expeditiously manage and organize a product liability MDL.

---

[2] Other class action cases include 19-cv-332 *Burnett et al v. National Association of Realtors* (settled/final settlement conference November 26, 2024) and *Gibson et al v. National Association of Realtors* et al, 23-cv-788 (Post Settlement Dist Form signed on July 9, 2025).

Judge Bough is also well published on the topic of MDLs in the legal community so he is widely considered to be an MDL legal scholar/expert. *A Judicial Perspective on Approaches to MDL Settlement"*, Stephen R. Bough & Anne E. Case-Halferty, 89 UMKC L. Rev. 2021, (Ex."1"); "*Collected Wisdom on Selecting Leaders and Managing MDLs*", Stephen R. Bough/Elizabeth Burch, 106 Judicature 69 (2022) (Ex. "2 "). Judge Bough's MDL writings focus on, *inter alia*, details/specifics of MDL case management, methods for handling complex scientific or legal concepts, approaches to narrowing differences between parties, and various judicial strategies to help the sides resolve disputes. The JPML also has a unique ability to compare Judge Bough's multidistrict case management philosophy with his actual work in litigation. For example, Judge Bough stated in "*Collected Wisdom on Selecting Leaders and Managing MDLs*", "[f]or newly appointed MDL judges, organizing the lawyers is the first and foremost pressing task" with the "universal goal in any MDL" to "assemble the best team." As further stated by Judge Bough in "*A Judicial Perspective on Approaches to MDL Settlement*:"

> Judges, by adopting creative and just solutions to address common impediments to MDL settlement, face the challenges of balancing the rights of the claimants and defendants with the expediency and efficiency offered by the MDL process. As every lawyer and judge knows, this is not a science. Every human and every case are a little different. Nevertheless, my goal as a federal judge—one I am confident is shared by my judicial peers—is to do everything in my power to keep a case progressing steadily toward resolution, whether that comes in the form of a jury trial or a global settlement agreement. Ultimately, we are seeking the "just, speedy, and inexpensive determination of every action." *Id*. at 12.

Judge Bough **currently presides over no MDL cases**. Therefore, Judge Bough would have ample time and resources to dedicate to Movant's, Interested Party's and the Related Actions.

Next, Missouri as a venue is centrally located in the Midwest and "America's Heartland". Kansas City, a "tier two" population American city, offers a balance of big-city amenities while offering a more manageable litigation destination than the respective sides would encounter in a

more massive U.S. city.   The Kansas City International Airport (MCI) is a true central airport location for access.  MCI further has the unique advantage of being within a *3-hour flight from either coast of the United States*.  MCI is easily accessible from all major cities across the United States and serves major domestic carriers and offers over 400 flights daily, with more than 50 nonstop destinations.

The U.S. District Court for Western District of Missouri is in downtown Kansas City approximately 20 miles from MCI.  Depending on the time of day and traffic, it is a short 22–24-minute drive from MCI to the Courthouse.[3]  There are also several hotels downtown Kansas City near to the Courthouse with wide-ranging price points.  Hotels include Phillips Kansas City, Curio Collection by Hilton, Hotel Kansas City-The Unbound Collection by Hyatt, Hilton President Kansas City, Holiday Inn Express Kansas City Downtown, and Hampton Inn Kansas City/Downtown Financial District.  There are many restaurants in downtown Kansas City. The Power & Light District and Crossroads Arts District offer options from casual to upscale dining.

### C.    Northern District of California (Judge Orrick) As Alternative Suitable MDL Transferee Court for This Complex Product Liability MDL

*Alternatively*, the Northern District of California federal court in San Francisco, California, where Judge Orrick has presided as a federal judge since 2013, and as a senior judge since 2023 is an excellent choice for the venue for this MDL as well.

Judge Orrick would be an ideal alternative judge to preside over this matter as he has extensive experience overseeing complex civil litigation, including *In re: Juul Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation* (MDL 2913), which has been mostly resolved. In assigning the *Juul* MDL to Judge Orrick, the Panel emphasized that he is "an

---

[3]    Transportation includes a central rental car facility near the airport, free shuttle bus, taxis, bus, town cars, Lyft or Uber/UberX (rates from MCI to federal court range from $55-$85).

experienced transferee judge" and "[w]e are confident that he will steer this litigation on a prudent course." *In re Juul Labs, Inc.*, 396 F. Supp. 3d 1366, 1368 (J.P.M.L. 2019). Judge Orrick's handling of MDL 2913 epitomizes judicial leadership in a complex MDL that he will easily be able to apply to the current product liability MDL.

Similarly, the Northern District of California would be an excellent alternative transferee federal district for this MDL litigation for several reasons. Roblox, Discord and Meta are headquartered in the district (with Snap not far away) thereby making discovery an efficient and convenient exercise for the Court, parties, experts and witnesses. By far, most related cases have been filed in the Northern District of California including the 1st of 13. *See, e.g.*, *In re PepsiCo, Inc., Bottled Water Mktg. & Sales Practices Litig.*, 560 F. Supp. 2d 1348, 1349 (J.P.M.L. 2008) (selecting a transferee district in part because two of four filed actions were already pending there); *In re Fosamax Prods. Liab. Litig.*, 444 F. Supp. 2d 1347, 1349-50 (J.P.M.L. 2006) (15 of 19 actions already pending in transferee district). Moreover, the Plaintiffs in those actions already moved to relate the rest of the cases to the Northern District, with such motion already set on an expedited schedule. *See In re Air Crash near Peixoto De Azevada, Brazil on Sept. 29, 2006*, 493 F. Supp. 2d 1374, 1375 (J.P.M.L. 2007) (transfer appropriate to district of <u>first</u> filed case).

Additionally, the Northern District of California with 24 judges, has the manpower, judicial expertise, and MDL case management experience to handle this complex MDL. In 2024, while 9,275 were filed, 10,686 were terminated.[4] Although there are 15 open and active MDLs pending in the district,[5] the majority of these MDLs are older and nearing completion. Finally, as set forth

---

[4] United States Courts, Statistical Tables for the Federal Judiciary, Table Number C-5, https://www.uscourts.gov/data-table-report-names/statistical-tables-federal-judiciary.
[5] U.S. District Court, Northern District of California, Active MDLs in the Northern District, https://cand.uscourts.gov/multidistrict_litigation/.

in greater detail in Movant's brief, the Northern District has extensive experience coordinating state and federal cases.

## III.    CONCLUSION

For the reasons set forth herein, the Interested Party Plaintiffs Jane Doe G.C., as guardian and minor child, Jane Doe A.C. respectfully request that the Panel consolidate, for pretrial purposes, all Roblox Child Sexual Predation litigation actions and transfer all actions on the original Schedule of Actions, all related actions, and all subsequently filed tag-along cases to the Western District of Missouri (to Judge Bough) or alternatively to the Northern District of California (to Judge Orrick) for centralization pursuant to 28 U.S.C. § 1407.

Dated:  September 24, 2025                      Respectfully submitted,

**DOLMAN LAW GROUP**

By:  */s/ Matthew A. Dolman*
Matthew A. Dolman
matt@dolmanlaw.com
R. Stanley Gipe
stan.gipe@dolmanlaw.com
Sara D. Beller
sara.beller@dolmanlaw.com
Deborah M. Schmitt
Deborah.schmitt@dolmanlaw.com
800 N. Belcher Rd.
Clearwater, FL 33765
Tel: (727) 451-6900; Fax: (727) 451-6907

*Counsel for Plaintiff Jane Doe G.C., As*
*Guardian And Next Friend Of Minor*
*Plaintiff, Jane Doe A.C*

**MDL No. 3166**
*Interested Party Response of*
*Jane Doe G.C & minor child A.C.*

# "EXHIBIT 1"

# UMKC Law Review

Volume 89
Number 4 *Multidistrict Litigation: Judicial and
Practitioner Perspectives*                                    Article 17

6-2021

# A Judicial Perspective on Approaches to MDL Settlement

Stephen R. Bough
*Western Court District of Missouri*

Anne E. Case-Halferty
*Western Court District of Missouri*

Follow this and additional works at: https://irlaw.umkc.edu/lawreview

 Part of the Law Commons

## Recommended Citation

Stephen R. Bough & Anne E. Case-Halferty, *A Judicial Perspective on Approaches to MDL Settlement*, 89 UMKC L. Rev. (2021).
Available at: https://irlaw.umkc.edu/lawreview/vol89/iss4/17

This Article is brought to you for free and open access by UMKC School of Law Institutional Repository. It has been accepted for inclusion in UMKC Law Review by an authorized editor of UMKC School of Law Institutional Repository.

# A JUDICIAL PERSPECTIVE ON APPROACHES TO MDL SETTLEMENT

Judge Stephen R. Bough[*] and Anne E. Case-Halferty[**]

For as many different types[1] of Multidistrict Litigation ("MDL") that exist, there are at least as many different approaches to settlement of an MDL. Considering that "[f]or the first time in its 50-year history, multidistrict litigation makes up more than 50 percent of the federal civil caseload"[2] and close to fifteen percent of all lawsuits in the nation,[3] it is not surprising that most MDLs end in settlement because most civil cases settle.[4]  But as with many of the issues raised by MDLs, settlement can present a double-edged sword: "MDLs make global peace easier to obtain for defendants, but they also put a lot of power in the hands of the judges selected to oversee them."[5]

Given that "MDLs were created in the 1960s to relieve crowded backlogs in federal courts,"[6] federal judges handling these large and complex cases have become adept at resolving them. Criticism regarding forced settlements comes from both the defense side[7] and the plaintiff perspective.[8]  This article, interspersed

---

[*] Stephen R. Bough is a United States District Court Judge for the Western District of Missouri and a graduate of the University of Missouri–Kansas City School of Law, where he served as Editor in Chief of the *UMKC Law Review*. Prior to joining the bench in 2014, Judge Bough practiced law as a civil litigator for nearly twenty years.

[**] Anne E. Case-Halferty serves as a law clerk to the Honorable Stephen R. Bough. She is a 2019 graduate of the University of Missouri–Kansas City School of Law, where she also served as Editor in Chief of the *UMKC Law Review*. Following her clerkship, she will begin as an associate at Shook, Hardy, and Bacon LLP.

[1] In 2019, the most common types of MDLs were product liability (34.2%), antitrust (24.7%), sales practices (10.5%), intellectual property (15.8%), securities (2.6%), contract (2.1%), common disaster (1.6%), employment practices (0.5%), and miscellaneous claims (17.9%). *See* U.S. JUDICIAL PANEL ON MULTIDISTRICT LITIG., CALENDAR YEAR STATISTICS: JANUARY THROUGH DECEMBER 2019, at 11 (2019).

[2] Daniel S. Wittenberg, *Multidistrict Litigation: Dominating the Federal Docket*, AM. BAR ASS'N (Feb. 19, 2020), https://www.americanbar.org/groups/litigation/publications/litigation-news/business-litigation/multidistrict-litigation-dominating-federal-docket/.

[3] Terry Turner, *Multidistrict Litigation*, DRUGWATCH.COM (June 29, 2020), https://www.drugwatch.com/lawsuits/multidistrict-litigation/.

[4] *See* ROBERT H. KLONOFF, FEDERAL MULTIDISTRICT LITIGATION IN A NUTSHELL 243 (2020) ("[Ninety-seven] percent of all MDLs are resolved by the transferee court, either by settlement or other disposition. (Of course, the vast majority of non-MDL cases settle as well.)").

[5] *Multi-district Litigation Proceedings (MDLs)*, FEDERALIST SOC'Y PRAC. GRP. PODCAST (Sept. 20, 2019) (transcript available at https://fedsoc.org/events/multi-district-litigation-proceedings-mdls).

[6] Turner, *supra* note 3.

[7] Stephen McConnell, *MDL Judges: Information-Forcing or Settlement Forcing?*, DRUG & DEVICE L. BLOG (Sept. 7, 2016), https://www.druganddevicelawblog.com/2016/09/mdl-judges-information-forcing-or-settlement-forcing.html ("[F]ar too many MDL judges act as if any defendant who does not gallop over to the plaintiff steering committee with a settlement offer, a grid, and an open checkbook needs a spanking.").

[8] William Cash, *Is it Time to Rethink the MDL for Mass Tort Cases?*, NAT'L TRIAL LAWS. (Sept. 1, 2015), https://thenationaltriallawyers.org/2015/09/rethink-the-mdl-for-mass-tort-cases/ ("In many cases, the company makes just one offer—take it or leave it—to the entire universe of plaintiffs.").

*UMKC LAW REVIEW*                          [Vol. 89:4

with the wisdom of experienced federal MDL judges, examines several approaches
to MDL settlement and the practical application of these varying methods.

## I.  APPROACHES TO MDL SETTLEMENT: AN OVERVIEW

"Multidistrict litigation presents a federal judge with difficult
management, intellectual, and personal challenges."[9]  As United States District
Judge Gary Fenner of the Western District of Missouri observed:

> I have found my MDL cases to be very much like other complex civil
> litigation. They are without a doubt more challenging from a legal and
> management standpoint, but establishing and enforcing a realistic
> scheduling order, timely ruling motions, and being available to resolve
> disputes moves cases.[10]

These sentiments are echoed by United States District Judge John Lungstrum from
the District of Kansas, who stated:

> I believe the most effective way to resolve an MDL is early on to set
> deadlines, including for trial(s), and stick to them. And as a corollary,
> rule on motions, such as for dismissal or for class certification, promptly.
> Each MDL is different, but they share the common trait of needing
> hands-on management by the judge that sends the clear message that this
> will not become a black hole.[11]

While some federal judges take a very hands-off approach to managing normal
civil litigation, every MDL judge appears to take a very active role in moving an
MDL. The Manual for Complex Litigation, "the 'bible' for complex cases in the
federal courts,"[12] speaks to the role an MDL judge plays in settlement:

> One of the values of multidistrict proceedings is that they bring before a
> single judge all of the federal cases, parties, and counsel comprising the
> litigation. They therefore afford a unique opportunity for the negotiation
> of a global settlement. Few cases are remanded for trial; most
> multidistrict litigation is settled in the transferee court. As a transferee

---

[9] U.S. JUDICIAL PANEL ON MULTIDISTRICT LITIG. & FED. JUDICIAL CTR., TEN STEPS TO BETTER CASE
MANAGEMENT; A GUIDE FOR MULTIDISTRICT LITIGATION FOR TRANSFEREE JUDGES, at v (2d ed. 2014)
[hereinafter TEN STEPS TO BETTER CASE MANAGEMENT].
[10] Interview with the Honorable Gary Fenner, United States District Judge for the Western District
of Missouri (July 8, 2020).
[11] Interview with the Honorable John Lungstrum, United States District Judge for the District of
Kansas (July 7, 2020).
[12] Christine Durham, *Taming the Monster Case: Management of Complex Litigation*, 4 J.L. & INEQ.
123, 124 (1986).

2021]    *A JUDICIAL PERSPECTIVE*    973

judge, it is advisable to make the most of this opportunity and facilitate the settlement of the federal and any related state cases.[13]

While the Manual for Complex Litigation does not specifically address techniques to settle an MDL, it offers several guideposts: setting a firm bellwether trial date, referring mediation to another judge and/or an outside mediator, engaging in confidential discussions with the judge, appointing settlement counsel and special masters, issuing orders barring contribution, making offers of judgment, and severing important issue(s) for a separate trial.[14]    These broad approaches are tools that already exist in every judge's toolbox.

## A. First Things First: Remove the Obstacle

Professor Robert H. Klonoff, in his recent book, *Federal Multidistrict Litigation in a Nutshell*, observes that:

> Most MDL judges view their job as attempting, whenever possible, to dispose of the cases so that they are not remanded to the transferor courts. Some judges have been clear about this objective, noting early on their goal of achieving a global settlement. For instance, in the widely publicized *National Prescription Opiate* MDL, the transferee judge strongly suggested at his initial hearing as MDL judge that his goal was to oversee a comprehensive settlement. He noted that "[p]eople aren't interested in figuring out the answer to interesting legal questions like preemption and learned intermediary, or unraveling complicated conspiracy theories. . . . [M]y objective is to do something meaningful to abate this crisis and to do it [quickly]."[15]

This approach is called "remove the obstacle." United States District Judge Dan Polster for the Northern District of Ohio, the Opioid MDL judge cited to by Professor Klonoff, expanded on the removal of obstacle approach:

> [Judge Charles] Breyer has cogently stated that the main task of the MDL Transferee Judge is to identify early on the principal impediment to resolution, and then to structure the MDL to tackle that impediment. You generally have excellent counsel on both sides, and by engaging in focused discussion with them the judge should be able to identify the issue and then to develop an action plan. It may be a purely legal issue that needs to be briefed and decided. It may be an issue that requires fact and/or expert discovery. It may be the need to coordinate the MDL litigation with investigations and enforcement actions by the federal government, or by state Attorneys General. Or in the case of a truly

---

[13] MANUAL FOR COMPLEX LITIGATION (FOURTH) § 20.132 (2004).

[14] *See id.* § 13.13.

[15] KLONOFF, *supra* note 4, at 223.

UMKC Law Review, Vol. 89, No. 4 [2021], Art. 17

974                    *UMKC LAW REVIEW*                    [Vol. 89:4

unique challenge such as the one posed by the Opioid MDL, it could be
the need to create a new structure that would permit global resolution.[16]

Identifying the obstacle is the first hurdle. Obstacles to settlement can take
many forms. For example, defense counsel may not disclose that there is a dispute
about insurance coverage between insurance carriers. In-fighting among plaintiffs'
counsel might not be readily apparent. Genuine legal issues may need to be
resolved before settlement can be realistically discussed. Experienced MDL judges
often hold regular and frequent status and telephone conferences to address and
proactively resolve these types of obstacles.[17] In-person hearings—where lawyers,
judges, and maybe even the parties, can all see each other—are a great way to keep
the case moving and, to borrow Judge Polster's phrase, promote a more honest
"focused discussion" about the real obstacle preventing settlement.[18] Once that
obstacle is identified, the additional methods that follow may further assist in
removing common barriers to settlement.

### B. There Is No Substitute for Hard Work

As any Midwestern farm kid will tell you, the value of hard work can never
be overlooked. In an MDL context, prioritizing the resolution of any dominant
legal issue early in the MDL process can pave the way for settlement. One less-
aggressive approach to encouraging MDL settlement is emphasizing mediation
early on in the litigation process. As suggested in *Ten Steps to Better Case
Management: A Guide for Multidistrict Litigation*, "it may be a good idea to
suggest that counsel establish a mediation structure, select a mediator, and begin
settlement negotiations."[19] The following are aggressive approaches that promote
settlement yet require additional hard work by judges and the parties alike.

### 1. Front-Load Dispositive Issues, Including Preemption and Scientific Causation

MDLs come in many shapes and sizes, with each raising a different set of
legal issues and problems. Preemption may be the vital legal issue in a
pharmaceutical product liability claim, but may be inapplicable in a sales practices
suit. Structuring and scheduling an MDL in a manner that allows the MDL's
significant and dispositive issues to be addressed and resolved in an expedient
manner can help lay the groundwork for productive settlement discussions down
the road. Preemption was an enormous issue in the National Football League's
concussion MDL, so much so that United States District Judge Anita Brody of the
Eastern District of Pennsylvania stayed discovery to allow the parties to file only

---

[16] Interview with the Honorable Dan Polster, United States District Judge for the Northern District
of Ohio (July 9, 2020).
[17] *See* TEN STEPS TO BETTER CASE MANAGEMENT, *supra* note 9, at 6.
[18] *See* Interview with the Honorable Dan Polster, *supra* note 16.
[19] TEN STEPS TO BETTER CASE MANAGEMENT, *supra* note 9, at 7.

preemption-based motions to dismiss.[20]  United States District Judge Richard Gergle of the District of South Carolina emphasizes the importance of tackling science issues early:

> I am often surprised how often complex science issues that are critical to the outcome of litigation have not been thoroughly addressed and thought through by the parties. The early focus by the Court on these issues can help the parties to do additional work and narrow the differences that may exist between them. In my [aqueous film-form foams] AFFF MDL, I asked the parties to each give me a set of 10 articles that they considered the most important to support their positions on the science. There was not a single article in common from the 10 provided each by the plaintiffs and defendants!  I have also found very useful a Science Day early in the MDL to sort out what the parties know and claim to know about the science underlying their claims. I conducted a Science Day in my AFFF MDL in which I had each party present to me three experts. No direct or cross, just presentations to me by the experts and responses to my questions. I found the Science Day very helpful in getting me up to speed on the science.[21]

While the legal hurdles are different in every case, preemption and scientific causation are two frequent impediments that have been effectively addressed by experienced MDL judges by prioritizing them early in the litigation. Investing the effort and time to resolve or clarify those issues at the beginning of an MDL can yield positive results and help streamline other aspects of the litigation, including settlement.

### 2.  Appoint a Settlement Committee

Just as Stephen R. Covey advises us to "begin with the end in mind,"[22] United States District Judge Charles Breyer of the Northern District of California appointed the settlement committee at the very beginning of the Volkswagen Clean Diesel MDL.[23]  Appointing a settlement committee at the onset of an MDL emphasizes that settlement is a priority to the court and, in turn, should similarly be a priority to all parties involved.

Once appointed, ideally a settlement committee will not lie dormant, but each judge must decide the extent of his or her engagement in settlement talks. Some judges actively engage the settlement committee by scheduling frequent

---

[20] *See In re* Nat'l Football League Players' Concussion Injury Litig., 307 F.R.D. 351, 390 (E.D. Pa. 2015).

[21] Interview with the Honorable Richard Gergel, United States District Judge for the District of South Carolina (July 17, 2020).

[22] *See generally* STEPHEN R. COVEY, THE SEVEN HABITS OF HIGHLY EFFECTIVE PEOPLE 109 (25th ed. 2020).

[23] *See generally In re* Volkswagen "Clean Diesel" Mktg., Sales Practices and Prods. Liab. Litig., 148 F. Supp. 3d 1367, 1368 (J.P.M.L. 2015).

976                          *UMKC LAW REVIEW*                          [Vol. 89:4

hearings and ordering counsel, parties, and insurance carriers to appear. Judge Brody in the NFL Concussion MDL rejected the first proposed settlement of $765 million because she "was primarily concerned that the capped fund would exhaust before the 65-year life of the Settlement."[24]   Judge Brody later approved an uncapped resolution after she ordered actuarial data to be shared with the special master.[25]   Some judges may opt for a different approach depending on the nature of the MDL. In a class action context, it is important to note that "[i]n reviewing the settlement, the court is acting as a fiduciary for the class"[26] and the "judge cannot rewrite the agreement."[27]   While the role as a fiduciary for the class is not without controversy, that role becomes even more complicated the deeper a judge ventures into the settlement conversation, especially in a non-class MDL where there is no true statutory basis for approval of the settlement. Nevertheless, no matter how involved or hands-on a judge plans to be in the settlement process, appointing and utilizing a settlement committee from the onset remains an important step in ensuring the steady progression and resolution of an MDL.

### 3. Appoint a Respected Settlement Master

Many federal judges have opted to appoint settlement masters to keep the parties focused on resolving the case. Settlement masters have been utilized to reach global settlements in large-scale tort litigation dating back to at least the late 1980s, and "[c]ourts have come to realize that the appointment of a neutral third-party who is granted quasi-judicial authority to act as a buffer between the court and the parties can provide a useful approach to reaching a settlement."[28]   Once the settlement master is appointed (either unilaterally or with the input of the parties), most MDL judges enter an extensive order outlining the settlement master's powers and regularly follow up with the parties and the master.[29]   David Cohen, one of the most nationally well-known special masters, observed:

> Similar to a "regular" case, nothing encourages global MDL settlement like setting bellwether trials (and more than one trial can be scheduled right from the start). It may take more than one, but choosing MDL bellwethers and trying them to verdict provides information the parties need to value their litigation. Also, Discovery Masters and Settlement

---

[24] *In re* Nat'l Football League Players Concussion Injury Litig., 307 F.R.D. at 364.
[25] *Id.*
[26] KLONOFF, *supra* note 4, at 255.
[27] MANUAL FOR COMPLEX LITIGATION, *supra* note 13, at § 21.61.
[28] ACADEMY OF COURT-APPOINTED MASTERS, APPOINTING SPECIAL MASTERS AND OTHER JUDICIAL ADJUNCTS: A HANDBOOK FOR JUDGES AND LAWYERS 4, § 1.1 (2d ed. 2009).
[29] *See, e.g., In re* Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., No. 2672 CRB (JSC), 2016 WL 4010049, at *1 (N.D. Cal. July 26, 2016) (discussing appointment of former FBI Director Robert Mueller as settlement master and his role in settlement negotiations); *see also* Reuters, *This Former FBI Director will be Volkswagen's "Settlement Master"*, FORTUNE (Jan. 19, 2016), https://fortune.com/2016/01/19/volkswagen-robert-mueller/.

Masters undoubtedly grease the skids to get trials and settlements to occur more efficiently and quickly.[30]

Judges have increasingly opted to appoint special masters with expertise in fields of particular relevance to the litigation (e.g., accounting, finance, science, and technology).[31] The Manual for Complex Litigation offers an excellent discussion and comparison of the pros and cons associated with utilizing a special master versus a magistrate judge in the settlement-negotiation process.[32]

### 4. Order Fact Sheets to Establish an Inventory List

Mass tort settlements are "importantly different" from other types of MDLs and require the valuation of large groups of claims.[33] To help establish the value of the underlying claims in an MDL, judges in over half of all MDL proceedings have ordered plaintiffs to complete plaintiff fact sheets—"party-negotiated and court-approved standardized questionnaires that seek information about parties' claims and defenses."[34] Fact sheets typically include the claimant's personal identification information and other relevant data, e.g., health records or litigation history.[35] Sometimes the fact sheets go even deeper into discovery[36] and are used by defendants to value the inventory list of claims in the MDL.

Some judges have found that mandating the use of fact sheets is a quick way to get the MDL lawyers to know their inventories.[37] Professor Elizabeth Burch of the University of Georgia School of Law analyzed "all publicly available non-class [MDL] settlements," which each involved the negotiated resolution of inventories.[38] Fact sheets, however, are not universally viewed with favor by either the plaintiff or defense perspective. Plaintiff lawyers have occasionally opposed fact sheets,[39] and some defense attorneys believe fact sheets are not a good

---

[30] Interview with Attorney David Cohen, Charter Member of Academy of Court-Appointed Masters (July 20, 2020).

[31] MANUAL FOR COMPLEX LITIGATION, *supra* note 13, at § 11.52.

[32] *See id.* §§ 11.52-.53.

[33] *See* Lynn A. Baker, *Mass Tort Remedies and the Puzzle of the Disappearing Defendant*, 98 TEX. L. REV. 1165, 1166 (2020).

[34] MARGARET S. WILLIAMS, JASON A. CANTONE, & EMERY G. LEE III, FED. JUDICIAL CTR., PLAINTIFF FACT SHEETS IN MULTIDISTRICT LITIGATION PROCEEDINGS: A GUIDE FOR TRANSFEREE JUDGES 2-3 (2019).

[35] *See id.* at 1-3.

[36] *See, e.g.*, Plaintiff Fact Sheet, *In re* C.R. Bard, Inc. Pelvic Repair Sys. Prods. Liab. Litig., No. 2187, *available at* https://www.wvsd.uscourts.gov/MDL/2187/pdfs/PFS.pdf (United States District Judge Joseph R. Goodwin ordered plaintiffs to use a twenty-four page fact sheet inquiring into, among other things, the pelvic mesh product lot number, date of implant, and doctor's name and address).

[37] *See* WILLIAMS ET AL., *supra* note 34, at 1-3.

[38] *See* Elizabeth Chamblee Burch, *Monopolies in Multidistrict Litigation*, 70 VAND. L. REV. 67, 87 (2017).

[39] *See* Cash, *supra* note 8 ("Somewhere along the way from the creation of the modern mass tort, to today, [the plaintiffs' bar] accepted the notion that all cases were the same, all cases could fit into the same tidy plaintiff's fact sheet, and the same judge could and should decide all the issues. Why?").

*UMKC LAW REVIEW*                          [Vol. 89:4

substitution for getting rid of frivolous cases. Objections to fact sheets and the shortcomings[40] of their use aside, plaintiff steering committees and defendants need to have some idea of scale when they are evaluating resolution of an MDL by settlement. "Settlement talks are often delayed precisely because the parties have not anticipated the need for assembling information necessary to assess the strengths and weaknesses of the global litigation and examine the potential value of individual claims."[41] Fact sheet usage in mass tort MDLs is at least one helpful judicial tool used to create an inventory of the claims that can smooth the path to future settlement talks.

### 5. Implement a Focused, Targeted Discovery Plan

Once the lawyers and the judge have a firm grasp on the scope and scale of the MDL, tailoring a discovery plan that focuses on the main legal issues or disputes is an effective strategy for moving the MDL toward resolution. United States District Judge Fernando Gaitan from the Western District of Missouri states that in his experience, "the most effective approach on resolving an MDL case is limited and targeted discovery."[42] The value of this approach cannot be overstated. When formulating a discovery schedule, judges should consider the obstacles or dispositive legal issues raised by the MDL and how targeted discovery may be able to narrow the scope of litigation and pave the way to a more expedient resolution.

Crafting a focused discovery plan responsive to the issues and needs of a given MDL takes more work and planning from all parties involved. In addition to simply entering a case management order, "[s]equencing the discovery and briefing necessary to resolve class certification and summary judgment is one of [an MDL judge's] most vital tasks. . . . On the other hand, limited discovery or 'reverse sequencing' may be appropriate if settlement is likely."[43] Whatever the circumstance, constructing a focused and targeted discovery plan requires judges to have candid, honest discussions with counsel about the sticking points in their cases and what information is needed from either side. In my own experience on the bench, I have found that lawyers generally know the real issues in the case and the information needed to move forward. During a regular scheduling hearing, I ask each attorney the following question: "What do you need from the other side to evaluate the case?" The lawyers are usually very candid, whether it be medical records, deposition of the plaintiff, or business valuation. From my perspective, these conversations help me issue orders that facilitate production and impose or alter deadlines based on the parties' needs. While the scale of discovery is

---

[40] *See* Burch, *supra* note 38, at 70 ("Clients are people, not inventories.").
[41] DUKE UNIV., BOLCH-DUKE CONFERENCE, GUIDELINES AND BEST PRACTICES FOR LARGE AND MASS-TORT MDLs 1 (2018), https://judicialstudies.duke.edu/sites/default/files/centers/judicialstudies/panel_4-plaintiff_fact_sheets.pdf.
[42] Interview with the Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri (July 7, 2020).
[43] TEN STEPS TO BETTER CASE MANAGEMENT, *supra* note 9, at 3-4.

2021]                    *A JUDICIAL PERSPECTIVE*                    979

obviously different in an MDL context, the same principles apply and, as exemplified by Judge Gaitan's experience,[44] are similarly effective.

## C.  Group Apples with Apples: The Multi-Track Approach

As the MDL process unfolds, it often becomes readily apparent that the one-size-fits-all approach does not work for all claims, even when there are common issues of law or fact. In my conversations with experienced federal judges who have overseen some of the largest and most complex MDLs in recent memory, several commented on the benefits of establishing different tracks for cases within an MDL. Categorizing cases into different tracks based on their complexity, progression, factual commonalities, relief sought, or other relevant dimensions can help prioritize and maximize the time and effort of the parties and the court. In many cases, it can also facilitate more expedient resolution. Organizing cases in this manner may allow for similarly positioned cases to be settled, thereby resolving a portion of the litigation and redirecting the parties' attention to the remaining cases.[45]

For example, United States District Judge Pattie B. Saris from the District of Massachusetts established two tracks in the *Pharmaceutical Industry Average Wholesale Price Litigation* MDL.[46] Track 1 was a "fast track" that involved five defendants, a bench trial, and extensive findings of fact and conclusions of law.[47] Track 2, in contrast, involved ten defendants, two hundred drugs, and the parties negotiated settlements largely based on the outcome of Track 1.[48] In the Bard IVC Filter Products Liability Litigation MDL, United States District Judge David Campbell of the District of Arizona developed a two-track approach based on how close the parties were to resolution.[49] After a bellwether trial, Judge Campbell established the following options:

> Track 1:  **Tentatively Resolved Cases.** These include cases or groups of cases that have been resolved in principle pursuant to an executed release or term sheet.

> Track 2:  **Cases Near Settlement.** These include cases or groups of cases that are the subject of substantive settlement negotiations in which

---

[44] *See* Interview with the Honorable Fernando J. Gaitan, Jr., *supra* note 42.
[45] *See* CATHERINE R. BORDEN, FED. JUDICIAL CTR., MANAGING RELATED PROPOSED CLASS ACTIONS IN MULTIDISTRICT LITIGATION 12 (2018).
[46] *See id.*
[47] *See id.*
[48] *See id.*
[49] Interview with the Honorable David Campbell, United States District Judge for the District of Arizona (July 8, 2020).

UMKC Law Review, Vol. 89, No. 4 [2021], Art. 17

980                          *UMKC LAW REVIEW*                          [Vol. 89:4

both sides agree that discussions have progressed to the point where
execution of a release or term sheet is likely in the near future.[50]

All other cases were to be remanded back to the transferor districts (or if directly
filed, then back to the proper district under 28 U.S.C. § 1404(a)).[51] Judge Campbell
also set specific reporting deadlines to ensure cases did not linger, stating that
"[t]he Court . . . advises the parties that it does not intend to delay remand or
transfer of MDL cases after a reasonable opportunity to settle."[52] The message
was clear: if the parties jointly believed settlement was moving along for an
individual case—great news, stay the course.[53] But if the case was not moving
toward settlement, pack your bags—the case was getting remanded to the
transferor court.[54]

## II. "NOT MY JOB": STRIKING A BALANCE

Federal judges are not a monolith that can be stereotyped. Though many
MDL judges actively strive to settle a case and view remand to the transferor court
as a failure, other judges think reaching a settlement is "not my job." Judges from
both camps must learn to strike a balance between establishing a framework to
allow the parties to resolve cases without forcing settlements on either party.
United States District Judge David Campbell from the District of Arizona
articulated his own approach in the massive *In re Bard IVC Filter* MDL:

> In my MDL, which was fairly large (about 8,500 cases), I held the same
> view that I do in my cases generally – that it is not my role to get directly
> involved in settlement discussions. So, I told the parties before the
> bellwether trials began that I would not hold the MDL for a sustained
> period after the trials to facilitate settlement. I explained my view that
> my work as an MDL judge would be done once we were through with
> discovery and resolution of MDL-wide motions.[55]

Judge Campbell's hard-work approach is straight out of the MDL enabling statute
that states: "[e]ach action so transferred shall be remanded by the panel at or before

---

[50] Case Management Order No. 42, at 5-6, *In re* Bard IVC Filters Prods. Liab. Litig., MDL 15-02641-PHX-DGC, (D. Ariz. Mar. 21, 2019).
[51] *Id.* at 6.
[52] *Id.* at 5.
[53] *See id.* at 5-6.
[54] *See id.* at 5-6. While beyond the scope of this article, a word of caution is warranted here. Large, complex litigation such as MDLs involves the overlap of state, federal, and even international jurisdiction, and a host of transjurisdictional issues can arise in the implementation of a global settlement agreement. Judges and attorneys facing these issues would be well-served by reading *Morphing Case Boundaries in Multidistrict Litigation Settlements*, an article by Professor Margaret S. Thomas exploring three paths taken by different federal judges in various MDL cases to address these transjurisdictional settlement issues. *See* Margaret S. Thomas, *Morphing Case Boundaries in Multidistrict Litigation Settlements*, 63 EMORY L.J. 1339 (2014).
[55] Interview with the Honorable David Campbell, *supra* note 49.

2021]                    *A JUDICIAL PERSPECTIVE*                    981

the district conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated."[56]    United States District Judge Kathryn Vratil of the District of Kansas, who served on the Judicial Panel on Multidistrict Litigation (JPML) from 2004-2013, echoes Judge Campbell's approach with her observation that "[n]othing encourages MDL settlement like an announcement that at the close of common discovery, the cases will be remanded to the transferee judges."[57]

Judicial involvement in MDL settlement has its place, and in many instances it can serve as a moderating force that protects the interests of the claimants. Professor Burch notes, in stating valid criticism of the extremely repetitive nature of steering committee appointments by lawyers who have never tried a case to verdict, that many MDL settlements are negotiated without "the threat of trial in the face of an unsatisfactory settlement offer."[58] Without the threat of trial, "[o]ften touted as the plaintiff's most valuable bargaining chip, multidistrict litigation eliminates that threat for all but a few bellwether cases."[59] Professor Burch suggests that an amendment to J.P.M.L. Rule 10.1(b) to require immediate remand of non-settling plaintiffs would help correct this imbalance.[60] The idea of immediate remand has to be music to Judge Campbell's and Judge Vratil's ears. Immediately remanding would not only help ensure the preservation of the constitutional right to trial by jury for all parties, but would also restore the balance between a plaintiff's lawyer's traditional threat to go to trial and a defense lawyer's ability to take her opponent up the courthouse stairs and into the courtroom.[61]

## III. CONCLUSION

Before I came on the federal bench, I had my own small plaintiffs' practice. I handled mostly personal injury claims and insurance coverage disputes, along with some class actions. I hated MDLs; it meant that my client's case would

---

[56] 28 U.S.C. § 1407(a).

[57] Interview with the Honorable Kathryn Vratil, United States District Judge for the District of Kansas (July 7, 2020).

[58] Burch, *supra* note 38, at 152.

[59] *Id.* at 152-53.

[60] *See id.* at 153.

[61] Their benefits aside, MDLs, the process of consolidation, how judges are appointed to the JPML, the lack of diversity on steering committees, and the power to review and approve non-class settlements are frequent areas of criticism. While beyond the scope of this article, numerous proposals for reform have been offered over the years to address these concerns. In particular, the Advisory Committee to the Civil Rules is currently taking comments on changes to the Federal Rules of Civil Procedure and an MDL subcommittee issued a related report in the Civil Rules Agenda Book on April 1, 2020. *See generally* ADVISORY COMMITTEE ON CIVIL RULES, MINUTES TO THE APRIL 1, 2020 MEETING OF THE ADVISORY COMMITTEE ON CIVIL RULES (Apr. 1, 2020), https://www.uscourts.gov/sites/default/files/04-2020_civil_rules_agenda_book.pdf. Whether these proposals remain ideas or are eventually translated into rules or amendments, recognizing the underlying concerns articulated by the MDL Subcommittee is important for judges and attorneys grappling with challenges and implications raised by the MDL settlement process.

*UMKC LAW REVIEW*                    [Vol. 89:4

be filed, get removed to federal court, and immediately be transferred to the court presiding over the MDL. The motion to remand would never be ruled on, the case would be settled without any communication with me or my client, and I would be stuck with trying to explain the "justice system" to my client and why I had not been "in the room where it happened."[62] It just felt wrong. Eventually I added a paragraph to my client contract stating that I would no longer represent them if the case got swept up into an MDL.

Now, as a federal trial judge, I am required to follow the rules for Multidistrict Litigation set forth in 28 U.S.C. § 1407. From my vantage point, I can now see the wisdom of consolidating one-half of the civil docket, and I am gaining an appreciation for the MDL system. But I still have genuine concerns about the treatment of the individual plaintiffs, the lack of communication by plaintiff steering committees, and viewing an individual claimant as merely part of an inventory. I also share many of Professor Burch's concerns about a homogenous monopoly of MDL lawyers exercising unchecked power over the MDL process.[63] Similarly, the idea that forcing a defendant to settle just because he or she has been sued several times (or several thousand times) offends my notions of fair play and due process. By talking to my judicial peers, I perceive that sometimes there is a feeling of failure if the cases are not all settled or resolved at the conclusion of the MDL proceeding. But if the right to jury trial is to be preserved,[64] defendants cannot be forced to settle whenever an MDL is formed. Forcing settlement on defendants only feeds the flames of plaintiff lawyers' advertising, monopolistic behavior in pre-formed committees, and third-party litigation finance.[65]

Judges, by adopting creative and just solutions to address common impediments to MDL settlement, face the challenges of balancing the rights of the claimants and defendants with the expediency and efficiency offered by the MDL process. As every lawyer and judge knows, this is not a science. Every human and every case are a little different. Nevertheless, my goal as a federal judge—one I am confident is shared by my judicial peers—is to do everything in my power to keep a case progressing steadily toward resolution, whether that comes in the form of a jury trial or a global settlement agreement. Ultimately, we are seeking the "just, speedy, and inexpensive determination of every action."[66] Achieving that goal with half the federal civil docket[67] just makes it a little more challenging.

---

[62] *See generally* Lin-Manuel Miranda, *Act II: The Room Where It Happens*, Hamilton: An American Musical (2015).

[63] *See generally* Burch, *supra* note 38, at 75.

[64] *See* U.S. Const., amend. VII ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.").

[65] *See* Jayme Herschkopf, Fed. Judicial Ctr., Third-Party Litigation Finance 1 (2017) (listing criticisms of third-party financing as increasing the number of weak cases, prolonging litigation, undercutting plaintiff and lawyer control, and constituting champerty).

[66] Fed. R. Civ. P. 1.

[67] *See* Wittenberg, *supra* note 2 (noting multidistrict litigation makes up more than fifty percent of the federal civil caseload and fifteen percent of all lawsuits in the nation).

**MDL No. 3166**
*Interested Party Response of*
*Jane Doe G.C & minor child A.C.*

**"EXHIBIT 2"**

The Bolch Judicial Institute at Duke Law. Reprinted with permission.
Duke Law School. 2019. All rights reserved. JUDICATURE.DUKE.EDU



Published by the Bolch Judicial Institute at Duke Law. Reprinted with permission.
© 2021 Duke University School of Law. All rights reserved. JUDICATURE.DUKE.EDU

# Collected Wisdom on Selecting Leaders and Managing MDLs

BY STEPHEN R. BOUGH & ELIZABETH CHAMBLEE BURCH

**In 2020**, *nearly one out of every two new suits* **filed in federal civil court was part of a multidistrict litigation (MDL).**[1] Initially designed to organize antitrust cases against electrical equipment manufacturers, MDL's adaptability and minimal requirements make it the preferred approach for coordinating pretrial process for all manner of cases, from securities, employment, intellectual property, and antitrust to sales practices, common disasters, and products liability. Yet, the simplicity of MDL's technical requirements — that cases are pending in different districts and share a common factual question — belies the complexity of the proceedings themselves.[2] Governed principally by insiders' unwritten but longstanding norms, both newly appointed MDL judges and lawyers with cases suddenly swept up in MDL may find themselves in unfamiliar waters.

For those both old and new to this burgeoning world, we have collected case-management wisdom from interviews with the federal judges who, as of Dec. 15, 2020, were handling the thorniest of MDLs: products-liability proceedings with over 500 cases.[3] Consider this article an insider's guide on how to navigate the critical first step — appointing lead attorneys. Based on our interviews, we also offer best-practice tips on permitting dissent and objections, heading off meritless cases, developing future stars, keeping lawyers fiscally responsible, progressing cases, maintaining transparency, and seeking help from magistrate judges versus special masters.

## MDL LEADERSHIP

For newly appointed MDL judges, organizing the lawyers is the first and most pressing task. But outside of the class-action context, no rules exist to guide judges. To fill this gap, we offer some generalized advice while bearing in mind that key differences may necessitate alternative structures. Managing a catastrophic oil spill such as BP's Deepwater Horizon, which demanded hyper-technical maritime knowledge, will differ from MDLs involving common products-liability claims over tractor hydraulic fluid. But both articles will have attorneys vying for coveted leadership positions.

Although leadership structures vary and might include defense committees alongside plaintiffs' committees, every proceeding has some hierarchy. Those chosen for lead roles are the ones who fund discovery and tackle the pretrial tasks that individually retained lawyers would ordinarily perform, such as taking depositions, filing and responding to motions, and negotiating settlements. On the plaintiffs' side, attorneys compete to earn sizeable "common-benefit fees," fees deducted from each MDL plaintiffs' attorneys' fee for the work leaders perform on their behalf.

The universal goal in any MDL is to assemble the best team — not to hand-pick the best individual lawyers. Just think: Drafting the top baseball players would typically yield a hodgepodge of outfielders and shortstops and leave bases unmanned — hardly a recipe ▶

From THE Bolch Judicial Institute at Duke Law. Reprinted with permission.
©2023 Duke University School of Law. All rights reserved. JUDICATURE.DUKE.EDU

for a winning season. And no person working alone could have put Neil Armstrong on the moon. The more complicated and complex the problem is, the more it calls for divergent skills, tools, and knowledge.

Judges tend to like MDLs for their complexity, the challenges they present, and the talented lawyers they attract. But solving the many problems MDLs offer — from convoluted legal postures to knotty scientific questions — requires a cognitively diverse set of minds. Complex tasks demand contrasting talents, and picking the best leadership team requires judges to assess the particular needs of their MDL, including what expertise, information, and traits will be important for that proceeding.

### SELECTION CONSIDERATIONS

Empirical studies suggest that well-functioning decision-making groups tend to have five or six members who think differently and are not afraid to challenge one another on substantive matters.[4] And while the judges we interviewed were quick to note that the "size of leadership depends on the case," some observed that leadership numbers can easily balloon. Oftentimes, the lawyers who land lead counsel roles have promised certain committee positions to others in return for their support during the nomination process. Discerning that some positions may have been doled out to placate attorneys in her MDL, Judge Freda Wolfson (District of New Jersey) was not convinced all the roles were necessary. She whittled the numbers down and made it clear at the outset that duplicative work would not be tolerated and attorneys wishing to share in the common-benefit fee must prove their added value.

**Complex tasks demand contrasting talents, and picking the best leadership team requires judges to assess the particular needs of their MDL, including what expertise, information, and traits will be important for that proceeding.**

**Traditional Factors.** *The Manual for Complex Litigation* recommends that judges choose leaders based on attorneys' qualifications, competence, financing abilities (including disclosure of agreements among counsel and third parties), and ability to "fairly represent the various interests in the litigation."[5] Some of our interviewees noted that, in addition to experience, they were looking for leadership qualities, great communication skills, and the ability to be diplomatic and cooperative. Several said that it is "important to have local counsel," and almost all thought that the selected leaders should be personally involved.

Above all, interviewees agreed that attorneys must be competent and able to handle the work. But judges didn't just take applicants at their word; "I read their résumés and did some research online," one judge said. Added another, "I called a couple of judges in other MDLs that had experience with some of these people to make sure that they'd done a good job and were reasonable people who actually showed up personally in the courtroom."

**Adequate Representation and Conflicts of Interest.** Because MDLs require only a common factual question — not that the common questions predominate as in Rule 23(b)(3) classes — plaintiffs' interests are likely to align on some issues and differ substantially on others. Balancing the competing interests that can arise presents a unique set of challenges. One judge said, "I think the judge has some responsibility to guide this and to make sure that the plaintiffs have some representation in the MDL."

Yet we heard little about how judges ensure that diverse plaintiffs are adequately represented when selecting leaders. As Judge Alvin Hellerstein (Southern District of New York) previously recognized in the mass-tort context, some lawyers represent huge inventories of clients who "may have differing interests and expectations" and, with large financial outlays that urge lawyers toward settlement, "representing a mass of litigants may interfere with a lawyer's ability to represent particular litigants."[6] He suggests that judges take a strong managerial approach "because the court is the only participant to the proceedings that is truly neutral, and only the court can ensure that conflicts arising in the representation do not unfairly harm plaintiffs."[7]

From the Bolch Judicial Institute at Duke Law. Reprinted with permission.
© 2025 Duke University School of Law. All rights reserved. JUDICATURE.DUKE.EDU

As Judge Hellerstein acknowledges, "[h]ow to ensure conflict-free representation, without intruding unduly on the lawyer-client relationship, is a difficult, but necessary, judicial task."[8] Still, helpful examples exist. The late Judge Jack Weinstein (Eastern District of New York) appointed a new plaintiffs' steering committee for non-settling plaintiffs in *Zyprexa* after the original committee negotiated a proposed deal with the defendant.[9] Similarly, Judge Eldon Fallon (Eastern District of Louisiana) appointed additional counsel to the plaintiffs' steering committee to represent ineligible or unenrolled claimants post-settlement in *Vioxx*.[10] Of course, conflicts can arise sooner and it is extraordinarily important to identify potential divisions early when choosing leaders to ensure that if structural conflicts of interest exist among plaintiffs, each subgroup has its own representative at the table.[11]

**Repeat Players.** Past judicial focus on experience, cooperation, and financing abilities has led to a relatively small group of insiders spearheading most MDLs. As one judge put it, "you were kind of stepping into a fraternity of players who already knew each other." Another saw this as a positive — knowing lawyers from previous proceedings means "there is some built-in trust." There are certainly benefits to having repeat players in leadership roles, such as capitalizing on economies of scale, leveraging experienced attorneys' familiarity with MDL norms, and signaling the proceeding's importance to others. Nevertheless, there are downsides, too.[12]

Judge Freda Wolfson cautioned that repeat players' comfort level with one another can translate into the lawyers thinking that they hold a certain sway with the court. But that presumptive boldness, whether intentional or not, does not sit well with judges. Moreover, when the same group of lawyers from the same group of law firms is tapped repeatedly — most of whom are still white and male[13] — there is not only decreased diversity, but also a cost to the legal profession as a whole: New lawyers cannot gain valuable experience in this increasingly important area of law.[14]

**Third-Party Funding.** Given the expense of litigating MDLs, financing concerns factored in heavily for judges. "It's a very expensive game to get into," one judge said. "You need a lot of money — a win is a long time out," which means that you're "going to get the big guys over and over because they have capital." As Judge Dan Polster (Northern District of Ohio) observed, "the biggest challenge with diversity in plaintiff leadership appointments is the financing issue." Without the ability to secure external financing, the inevitable cycle of repeat players continues. Large, up-front investments limit the number of firms that can commit capital and, consequently, the firms that do qualify are better positioned to secure future leadership positions because of the experience and resources gained from prior appointments.

Alternative litigation funding may provide a pathway to leadership for plaintiffs' attorneys without deep war chests. Although grave ethical concerns arise if a third party controls decision-making or settlement, third-party financing does not automatically cede that power to unauthorized entities. Judge Polster required any party using third-party financing to provide documents *in camera* and discuss the potential for the third party to influence settlement discussions, a practice that Judge Carl Barbier (Eastern District of Louisiana) plans to follow in the future.[15] Judicial *in camera* disclosure can help alleviate ethical concerns (some courts even require such disclosures routinely)[16] while keeping defendants from accessing the information, which judges largely agreed was not within defendants' rights to know. Judge David Campbell (District of Arizona) commented, "Defense counsel has strategic reasons for wanting to know about plaintiffs' financial capabilities, and there is no real reason why they should have a full-blown look into the source of funding."

When asking our interviewees about third-party funding, responses ranged from "the topic never came up" to "the first time I heard of it, I recoiled in horror." Those who did encounter it addressed it in various ways. For example, Judge Campbell meets with counsel, and if he is persuaded that they can finance the case, they need not prove the funding's source. And while Judge Richard Young (Southern District of Indiana) never broached the topic with counsel, it was well-known that the attorneys' immensely successful advertising campaign likely cost tens of millions of dollars, making him acutely aware that the money had to come from somewhere.

Although some judges expressed wariness of alternative financing in the legal profession generally, most did not think it was an issue in their MDLs. Moreover, they seemed to agree it would be difficult to craft an all-encompassing rule that would adequately cover the unique needs of individual proceedings. Plus, as Judge Campbell acknowledged, external financing is not limited to plaintiff firms; some defense firms have embraced it as well.

**Cultivating Diversity.** Judge Robert Kugler (District of New Jersey) noted that MDL leadership has typically been composed of white men — but to the bar's credit, this is changing, and ▶

© 2022 Bolch Judicial Institute at Duke Law. Reprinted with permission.
© 2022 Duke University School of Law. All rights reserved. JUDICATURE.DUKE.EDU

counsel now understand that leadership should be diverse. Importantly, his message was *not* that white males are bad lawyers, but that they aren't the *only* lawyers qualified to run complex MDLs. Still, white men generally make up the overwhelming majority of leadership appointments. As awareness of the repeat-player issue grows and society recognizes the moral, business, and democratic arguments favoring diversity, many judges are attempting to diversify lead counsel. Some focus on traditional identity diversity, aiming to include more women and minorities in leadership positions, while others consider cognitive diversity and seek out lawyers with varied life experiences, geographic placements, skills and abilities, and, antithetically, those who have not served as lead counsel before.

These efforts have not been without opposition. In *Martin v. Blessing*, a class member objected to Judge Harold Baer's (Southern District of New York) requirement that "class counsel ensure that the lawyers staffed on the case fairly reflect the class composition in terms of relevant race and gender metrics."[17] Weighing in on the Supreme Court's denial of certiorari, Justice Samuel A. Alito commented that he was "hard-pressed to see any ground on which Judge Baer's practice can be defended" and "doubtful that the practice in question could survive a constitutional challenge."[18]

Setting aside quotas and metrics, MDL judges have nevertheless found practical, creative ways to increase both identity and cognitive diversity — and with good reason. Research has shown that identity diversity (visible differences such as race, ethnicity, age, gender, physical limitations, and demographic dissimilarities) can be critically important where a particular demo-

> Cognitively diverse teams consistently see "bonuses" when members perform disjunctive, nonroutine, thought-provoking tasks like brainstorming legal strategies or identifying which issues to appeal.

graphic trait is at issue.[19] For example, in MDLs involving birth control like Yaz and NuvaRing, in which gender itself is at the crux of the proceeding, normative claims about representation, fairness, and social legitimacy should dictate a leadership roster broadly inclusive of women. In proceedings like these, one of our interviewees saw "many women attorneys because claimants felt they were better represented by woman lawyers." But studies are mixed when it comes to the business case for identity diversity outside these instances, with some suggesting that when team members perceive themselves as belonging to different groups, they may tune each other out and be less open to sharing privately held information for fear of being ridiculed or ostracized.[20]

The arguments and evidence are far more straightforward when it comes to cognitive diversity — meaning diverse knowledge and expertise stemming from training, experiences, and, yes, identity.[21] Cognitively diverse teams consistently see "bonuses" when members perform disjunctive, nonroutine, thought-provoking tasks like brainstorming legal strategies or identifying which issues to appeal.[22] By employing different tricks, reframing the problem in a new way, or offering varied perspectives, cognitively diverse teams can avoid getting stuck on thorny problems.[23]

Judges, too, are seeking cognitively diverse leaders. For instance, Judge William Orrick (Northern District of California) tells counsel up front that he is looking for diversity in *all* of its forms, not just gender and race, but in varied backgrounds and experiences. Another judge considers geography and law firm size, aiming for a mix of "big firms plus a single shingle." In her order seeking leadership applicants, Judge Robin Rosenberg (Southern District of Florida) said she wanted a plaintiff steering committee (PSC) that is "diverse and experienced, but also has a diversity of experiences — the leadership team should represent different skill sets, expertise, life experiences, and prior MDLs, so that together they can bring together a multiplicity of approaches to select the best ideas."[24] Interviewing applicants also gave Judge Rosenberg an opportunity to learn about those life experiences and question candidates about how they planned to foster diversity and mentorship within the team, if appointed.

Searching for relevant expertise can likewise lead to cognitive diversity. In presiding over the NCAA Concussion MDL, Judge John Lee (Northern District of Illinois) sought up-and-coming

From the Bolch Judicial Institute at Duke Law. Reprinted with permission.
© 2025 Duke University School of Law. All rights reserved. JUDICATURE.DUKE.EDU

leaders who shared experiences with the putative class members, not simply those who had prior MDL or trial expertise. Including attorneys who had played intercollegiate sports at NCAA-affiliated schools, he said, would "provide a unique insight on what putative class members might want."

Some judges likewise raised the need for identity diversity, at times implicitly linking it with the cognitive diversity that different demographics can produce. In his case management order, Judge Brian Martinotti (District of New Jersey) wrote, "Leadership and the committees are expected to be diverse in gender, ethnicity, geography, and experience."[25] He explained that the overall litigation benefits when different lawyers with varying backgrounds, experiences, and skillsets perform the required tasks. Furthermore, he has seen positive results after "opening the door that has been closed to young lawyers for so many years." He described these less experienced lawyers as "new blood," providing a fresh perspective that strengthens the legal profession.

Newcomers with relevant expertise "may be a rich source of ideas for improving group performance," explain psychologists, because they "lack strong personal ties to other members that inhibit their willingness to challenge group orthodoxy," are not already "committed to the group's task strategy," and "bring fresh perspectives gained in other groups."[26] Judge Freda Wolfson echoed psychologists, sharing that "the benefit of newcomers is that they bring new ideas. Additionally, it is important to this profession that new lawyers don't think all of the big cases are tied up by a small group of repeat players." Without intentionally allowing new players to develop in this technical area, she worried that those attorneys may remove them-

selves from consideration, a disservice to complex litigation in the long term.

Lawyers seem to be getting the message. "Plaintiffs' counsel was well aware that to make themselves look presentable they needed to give me a diverse group in terms of age and experience in the MDLs, certainly in terms of gender, to some degree ethnicity and race," one judge said. But as the larger MDLs still tend to be run by lawyers who are "mostly 55 and older" and who "tend to be white males," judicial nudges remain important. "Everyone can't keep looking like us; it's pretty darn white," one judge quipped. "It's our responsibility — we've benefited from the privilege."

**Developing Future Stars.** While thinking about diversity, Judge Richard Gergel (District of South Carolina) reflected: "I have noticed that many of the members of the leadership bring younger partners along, many of them

Judges Robin Rosenberg and John Lee each created internal programs and mentorship opportunities to foster less experienced attorneys' professional growth.

women, who seemed to be doing much of the work. I have tried to push this younger generation of lawyers into leadership positions." Other judges are doing the same. Judges Robin Rosenberg and John Lee each created internal programs and mentorship opportunities to foster less experienced attorneys' professional growth. Creating a leadership development committee allowed Judge Rosenberg "to get less experienced and diverse attorneys included in leadership" without sacrificing experience. She makes it clear to the leaders that the less experienced lawyers must be given real substantive work and constructive supervision; she also requires that one of these developing leaders speak or present at each monthly status meeting. Judge Lee requests "résumés from the future stars" of the law firms participating in leadership — a group that tends to be more diverse. Keen to incorporate more junior attorneys, he anticipates that these up-and-coming lawyers will be given substantive assignments and argue motions.

Both judges reported successful results: Up-and-comers brought novel ideas to the table which, when combined with experienced counsels' wealth of knowledge, added value to the proceedings. And the programs provided a structured avenue for less experienced but more diverse attorneys to break into a club historically reserved for a much smaller, tight-knit demographic.

## METHODOLOGY: CONSENSUS VS. APPLICATIONS

Given the many selection considerations already discussed, it is not surprising that judges vary in their methodology. Roughly two-thirds of our interviewees deferred to plaintiffs' ▶

© 2025 Bolch Judicial Institute at Duke Law. Reprinted with permission.
© 2025 Duke University School of Law. All rights reserved. JUDICATURE.DUKE.EDU

attorneys' "consensus" slates, where lawyers work out the organizational structure themselves and present the judge with an agreed-upon roster. One-third opted for an open application process, which allows judges to formally select leaders. Keeping in mind that one size does not fit all, we provide their perspectives and offer some advice.

**Consensus Method.** While undoubtedly more efficient — many plaintiffs' lawyers develop these cases before the Judicial Panel on Multidistrict Litigation centralizes them and already know which peers would make great leaders — the consensus method also tends to reinforce the repeat-player problem.[27] Judges who accepted proposed slates provided various rationales. One said, "Basically a handful of plaintiffs' firms figured out a way to make everyone happy." Another lamented, "I took the lazy man's way out and accepted the proposed slate. Next time, I would work harder to promote diversity."

Judge Brian Martinotti explained that as soon as an MDL judge is assigned, lawyers are already jockeying for a lead counsel position. Rather than take over *their* case, he viewed his role as shepherding counsel through the process, but not intervening where unnecessary. Plaintiffs' counsel know each other well, he observed, and, ultimately, as the people working closely with one another for the next few years, they are sufficiently incentivized to pick qualified leaders who will promote harmony and fairly distribute assignments.

One judge was prepared to consider applicants but, without instruction, plaintiffs' counsel had already organized themselves and suggested a diverse and geographically balanced leadership team. The judge explained, "It would take a lot for me to turn down what looked like a reasonable proposal that everyone agreed to." Finally, although attorneys presented Judge Richard Story (Northern District of Georgia) with a slate, he permitted additional applications "to assure no one was excluded from the process."

**Application Method.** Other judges advocate for open applications. In one of his orders, for example, Judge Eldon Fallon remarked that allowing attorneys to select one another "would

> In one of his orders, Judge Eldon Fallon remarked that allowing attorneys to select one another "would involve intrigue and side agreements which would make Macbeth appear to be a juvenile manipulator." Another judge told us simply, "I wasn't going to use the slate provided."

involve intrigue and side agreements which would make Macbeth appear to be a juvenile manipulator."[28] Another judge told us simply, "I wasn't going to use the slate provided." Judge Casey Rodgers (Northern District of Florida) likewise declined parties' suggestions. She observed that accepting a proposed slate, usually composed of MDL veterans, risked reducing newcomers' energy and innovative ideas. Judge Dan Polster agreed: "Without proactive lawyers and judges constantly trying to change the status quo, diversity will remain on autopilot and nothing will change." In his opinion, although a judge cannot manufacture lawyers and is, for all practical purposes, stuck with the pool of applicants who are interested in MDL positions, judges retain wide discretion and can set a positive, inclusive tone moving forward.

Judge Rodgers' approach pushes lawyers further: First, she made the process as transparent as possible by creating a panel that included herself, the magistrate judge, and a special master. Second, the panel then sorted through 190 applications. Third, from those, the panel selected 65 attorneys to present orally. Once selected, she prohibited leaders from changing the subcommittee structure. This allowed lead counsel to focus on running important day-to-day operations rather than spin their wheels managing lawyers who might maneuver for committee seats. Accordingly, leaders had to propose leadership changes directly to her.

Judge Robin Rosenberg required candidates to submit a three-page application that included relevant experience as well as an appendix with a list of all the lawyer's participating MDL cases, a list of other lawyers the applicant would recommend, a disclosure about use of third-party

© 2025 by the Bolch Judicial Institute at Duke Law. Reprinted with permission.
© 2025 Duke University School of Law. All rights reserved. JUDICATURE.DUKE.EDU

funding, and an *ex parte* affidavit concerning conflicts of interest. She used those applications and the candidate's requested position to schedule 15- to 20-minute interviews with all 66 applicants, a process that took two days to complete.

In Judge William Orrick's MDL, although the lawyers proposed a slate, he required anyone interested in a position to apply, and then conducted interviews, explaining that everyone should get an opportunity to present their oral pitch. Finally, Judge Vince Chhabria (Northern District of California) has experimented with multiple methods; in the *Roundup* MDL, attorneys presented him with a slate, but in his *Facebook* MDL, he created an application process, identified a diverse group of ten finalists to present, then ultimately selected leaders based on the finalists' credentials. Short interviews, even just a few minutes in length, gave him a sense of who he was dealing with.

Not all judges held in-person hearings. Judge Carl Barbier, for instance, relied entirely on attorneys' paper submissions and was wary of applicants using podium time to simply regurgitate their own qualifications or disparage others. Realizing that the lawyers were privy to certain information regarding their peers, however, he allowed applicants to object to specific appointments in writing.

**Balancing the Pros and Cons.** Applications give judges more control over who serves in key positions, but at the cost of time-intensive interviewing and vetting. For those interested in this method, one of us has created sample forms and an application scoring sheet to simplify matters.[29] On the other hand, permitting counsel to propose a slate practically ensures that leadership will cooperate — after all,

they handpicked each other — but this process tends to concentrate experience and power in the hands of a few repeat players and firms.

Such cooperation can thus come at a cost: Repeat players may be getting along just to ensure they are on the slate of the next big MDL, which means the best person for the task may not necessarily be getting the job. Some judges have found demanding up front that cognitive, geographic, and experiential diversity be included in any proposed slate has been relatively successful in producing a diverse and capable leadership team. Yet getting one's name on the roster could mean the lawyer already has a seat at the table.

### INTERIM, ANNUAL, OR PERMANENT APPOINTMENTS

Our interviewees differed on whether to appoint interim lead counsel before selecting permanent positions as well as whether to reappoint them annually. From a conflict-of-interest and diversity perspective, selecting interim counsel and giving the litigation a few months to develop before choosing more permanent leaders may give judges a better idea as to the potential fault lines among plaintiffs. Waiting can also expand the pool of available leaders beyond the usual suspects. Empirical data from the Federal Judicial Center demonstrates that repeat players appear much earlier in MDLs than do other attorneys.[30] Interim appointments can likewise give judges a sense as to whether the pick will be a good fit long-term; as one of our judges shared, "[Interim counsel] turned out to be a total buffoon, and I was in a little bit of a pickle because this guy can't be lead counsel." Another observed, "Lawyers who had

been instrumental as interim counsel felt entitled to more permanent roles once they became available, but I wanted to move in another direction." A third added, "I never should have appointed these [interim] folks. I dumped them."

Judges who appoint permanent counsel largely agreed that unless there was an issue with leadership, no reason existed for interruptions and turnover. For example, Judge Catherine Blake (District of Maryland) believes "if a judge gets the right people in charge initially, this additional reappointment work is unnecessary." Similarly, Judge Freda Wolfson observed that not only does lead counsel expect and prefer permanency, but that the purpose of the initial time-consuming selection process is to find qualified people who are willing to work hard for the MDL's duration.

Finally, some praised annual reappointments. They found that renewals set the tone that the position must be continuously earned and forced judges to have contact with lower-level committee members. During these check-ins, judges were able to determine which lawyers were contributing meaningfully and which, if any, were not pulling their weight. According to Judge Richard Gergel, "MDLs pose significant management challenges, and it is important that the judge have the tools to maintain control and to keep the litigation progressing forward. The ability to appoint and remove leadership in the MDL is simply one of those tools." While revisiting leadership annually does incentivize lead lawyers to continue working hard, it has the danger of making them principally beholden to the judge when judicial preferences might drive a wedge between lawyers and zealous client advocacy.

▶

Published by Bolch Judicial Institute at Duke Law. Reprinted with permission.
© 2022 Duke University School of Law. All rights reserved. JUDICATURE.DUKE.EDU

The better alternative might be to allow lead and nonlead attorneys to request leadership substitutions or additions if a chosen attorney neglects cases or if new information on conflicts comes to light. Even without making appointments annually, judges felt free to make changes if issues arose. Judge Brian Martinotti remarked, "Counsel knows it's within my discretion to change the leads at any time."

## PERMITTING DISSENT AND OBJECTIONS

Selecting leadership isn't an exact science. And even when judges aim to reap the benefits of a cognitively diverse team, when group members work together for years they may start to think alike and lose their edge. Like newcomers, outsiders — nonlead lawyers — can be a powerful source of fresh thinking and new information. Providing them with mechanisms to object to leaders' decisions when necessary doesn't just ensure due process, it can unravel the power of majority conformity, subject leaders' decisions to scrutiny, kindle divergent thinking (even when they are wrong!), and reveal new information.[31]

Whether the rationale is protecting due process or preventing a rush to judgment, judges would do well to pave a path for objections. Chief Judge Landya McCafferty (District of New Hampshire), for instance, allows any attorney to object, "provided that in doing so they do not repeat arguments, questions, or actions of lead counsel."[32] And although Judge Casey Rodgers does not have a formal structure for objections, she does have an open-door policy and a hands-on management style that allows her to talk with leaders and subcommittee members regularly. Yet, she, along with many

> Selecting leadership isn't an exact science. And even when judges aim to reap the benefits of a cognitively diverse team, when group members work together for years they may start to think alike and lose their edge. Like newcomers, outsiders — nonlead lawyers — can be a powerful source of fresh thinking and new information.

others with whom we spoke, expects dissenters to attempt to resolve any issues with leaders before approaching her.

## CASE MANAGEMENT PEARLS OF WISDOM

**Magistrate Judges vs. Special Masters.** To help manage high-volume MDLs, some judges rely on special masters, and others depend on magistrate judges. While both can ease the burden, empirical studies suggest that judges would do well to prioritize public resources by using magistrate judges, and that magistrate judges want MDL work.[33] Even controlling for factors like the number of cases, MDLs with special masters lasted 66 percent longer than those without.[34] Plus, MDL attorneys have raised concerns about special masters that range from sky-high costs, self-dealing, and bias to capture and cronyism between repeat players and repeat special masters.[35]

**Progressing Cases and Maintaining Transparency.** "The defendant wanted to try two cases a year — they'd be trying cases until 3200 at that rate!" lamented one judge. Most judges agreed that trial dates and status conferences keep cases progressing, and Judge Richard Young added that monthly conferences kept both him and the parties focused on key issues.

To combat contentiousness and promote collegiality pre-pandemic, Judge Richard Gergel suggested cocktail parties the evening before each monthly status conference, with firms alternating sponsorship and the court promising to attend so long as no one discussed the case. This led to the lawyers developing personal relationships that made disputes easier to resolve and gave Judge Gergel an opportunity to get to know the out-of-town attorneys.

One of our other interviewees has been meeting monthly with attorneys via Zoom during the pandemic, issu-

Published by the Bolch Judicial Institute at Duke Law. Reprinted with permission.
© 2022 Duke University School of Law. All rights reserved. JUDICATURE.DUKE.EDU

ing orders orally from the bench, and posting transcripts on the court's dedicated MDL website "so members of the MDL have the benefit of knowing why I ruled the way I did." This approach "keeps the case moving, and the litigants don't have to wait for 20 written orders." Others also mentioned the benefit of posting court documents on websites: "It's good for transparency," said one. Another related, "When I have periodic conference calls or have people in court, other lawyers are welcome to listen in, and I try to send out the case management orders broadly so others know what's happening in the litigation."

Continuing to hold virtual MDL status conferences with geographically dispersed attorneys post-pandemic can save costs, enable nonlead attorneys and litigants to listen in, and promote transparency for the lawyers — and even the plaintiffs themselves. Conversely, because many MDL lawyers travel from out of state, counsel needs to know up front if the court expects in-person attendance.

**"Meritless" Claims.** Complaints about "meritless" claims and the so-called "Field-of-Dreams" problem in MDLs abound, but there is little data on the issue or its extent. *Vioxx* is often cited as an illustrative example. In 2010, Judge Eldon Fallon reported that only two out of 50,000 claims were fraudulent[36]; in 2015, the claims administrator asked for additional information on 256 allegedly fraudulent claims and did not receive a response on 194.[37] Of the 62 who responded, 39 (or 46 percent) overcame the initial suspicion.

"Meritless" is not synonymous with "fraudulent." Non-colorable claims could fall under that umbrella for different reasons — some plaintiffs may have received a misdiagnosis from their doctors, while others may not be able to link their injuries to the defendant's drug or product. Some may receive little communication from their attorneys (and vice versa), and still others may simply fall outside of the scope of the claims that the plaintiffs' steering committee decides to develop.

Nevertheless, a preemptive warning to counsel at the outset can be helpful. In larger MDLs, the cases can grow exponentially through TV and internet advertising. Judge Richard Young found that he was spending a lot of time reviewing and then dismissing cases that were clearly outside the statute of limitations or statute of repose and that "lawyers really don't talk to their clients." When he asked counsel about including cases that were clearly unfit for trial, the response was less than adequate — usually a quick excuse by the attorney that "my legal assistant did the intake and must have missed that." Similarly, Judge Clay Land (Middle District of Georgia), who was not in our study, dealt with frivolous claims by putting plaintiffs' lawyers on notice that if their cases lacked a good-faith basis for continuing through summary judgment, he would require them to show cause as to why he should not impose sanctions.[38]

**Monthly Billable Hour Reports.** Judge Freda Wolfson warned that at the end of the proceeding, "too many people can come in and try to share the attorneys' fee," but "the [common-benefit fee] is for the people really doing the work." To head this off, several judges required all plaintiffs' attorneys to prepare and submit monthly time records so they could monitor who is working and who is not. Some, like Judge Stephen Bough (Western District of Missouri and an author of this article), further break down these reports by gender. And others, like Judge Carl Barbier, not only require monthly time reports, but also use a CPA to review them, monitor expenses, and point out anomalies. Hypothetically, if a lawyer claimed to read MDL emails for more than 24 hours in a single day, the issue could be promptly addressed.

Knowing that both the court and appointed leadership are monitoring their work promotes good participation and contributions by all. It also has the benefit of ensuring that another lawyer does not come in at the last moment and seek fees for unauthorized work.

## CONCLUSION

One judge said it all for us: "I love MDLs. I wish I had done more of them; they allow judges to be creative with lawyers." Although each MDL comes with its own set of challenges and some require unique solutions, we hope the bits of advice shared here will demystify MDLs for lawyers and judges alike. There is no one "right" way to run complex litigation, but learning from those who have traveled the path before can make the way easier. ▸

**STEPHEN R. BOUGH** is a United States District Court judge for the Western District of Missouri.

**ELIZABETH CHAMBLEE BURCH** is the Fuller E. Callaway Chair of Law at the University of Georgia School of Law.

© 2021 by the Bolch Judicial Institute of Duke Law. Reprinted with permission.
© 2021 Duke University School of Law. All rights reserved. JUDICATURE.DUKE.EDU

1   *U.S. District Courts — Judicial Business 2020*, U.S. Cᴛs., https://www.uscourts.gov/statistics-reports/us-district-courts-judicial-business-2020 (last visited Mar. 20, 2021) (listing 470,581 total filed cases in 2020); *Judicial Panel on Multidistrict Litigation — Judicial Business 2020*, U.S. Cᴛs., https://www.uscourts.gov/statistics-reports/judicial-panel-multidistrict-litigation-judicial-business-2020 (last visited Mar. 20, 2021) (listing 4,210 cases transferred and 227,285 initiated in the transferee districts for 231,495 cases filed in 2020). Most cases are from *In re 3M Combat Arms Earplug Products Liability Litigation*.

2   28 U.S.C. § 1407.

3   We selected proceedings with 500 or more cases pending on the MDL docket as of Dec. 15, 2020, and reached out to each MDL judge. Using a semi-structured interview process, we asked each the following five questions: (1) How do you approach the process of selecting lawyers to lead a proceeding; (2) Do you make interim or permanent leadership appointments? When in the proceeding do those selections occur; (3) How do you go about choosing leaders (e.g., consensus among lawyers, an open process, or have you developed a hybrid approach); (4) What criteria do you consider in making those appointments (e.g., experience, financing including third-party litigation financing, cooperation, diversity, etc.); and (5) Are nonsteering committee lawyers able to object to decisions

made by steering committees during the MDL? We spoke by phone with 17 and by email with one, for a total of 18 MDL judges, some of whom requested anonymity. We likewise examined their case-management orders.

4   While financing the suit may require leaders and steering committees to get buy-in from additional attorneys, empirical research suggests that "[g]roups containing 3 to 8 members [are] significantly more productive and more developmentally advanced than groups with 9 members or more," and productivity further increases in groups with 5 to 6 members. Susan A. Whelan, *Group Size, Group Development, and Group Productivity*, 40 Sᴍᴀʟʟ Gʀᴘ. Rsᴄʜ. 247, 247, 257–58 (2009).

5   Fᴇᴅ. Jᴜᴅ. Cᴛʀ., Mᴀɴᴜᴀʟ ғᴏʀ Cᴏᴍᴘʟᴇx Lɪᴛɪɢᴀᴛɪᴏɴ (Fᴏᴜʀᴛʜ) § 10.221 (2004).

6   Alvin K. Hellerstein, *Democratization of Mass Tort Litigation: Presiding Over Mass Tort Litigation to Enhance Participation and Control by the People Whose Claims Are Being Asserted*, 45 Cᴏʟᴜᴍ. J.L. & Sᴏᴄ. Pʀᴏʙs. 473, 474 (2012).

7   *Id.* at 477.

8   *Id.* at 475, 478.

9   *E.g.*, *In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d 256, 261–62 (E.D.N.Y. 2006).

10  *In re Vioxx Mktg., Sales Pracs., & Prods. Liab. Litig.*, MDL No. 1657 (E.D. La. Jan. 8, 2010) (Pretrial Order No. 45A).

11  Structural conflicts arise when there is a danger

that counsel "might skew [the litigation] systematically" to favor some plaintiffs over others "on grounds aside from reasoned evaluation of their respective claims or . . . disfavor claimants generally vis-à-vis the lawyers themselves." A.L.I., Pʀɪɴᴄɪᴘʟᴇs ᴏғ ᴛʜᴇ Lᴀᴡ ᴏғ Aɢɢʀᴇɢᴀᴛᴇ Lɪᴛɪɢᴀᴛɪᴏɴ § 2.07(a)(1)(B); *see also Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 627 (1997).

12  Elizabeth Chamblee Burch & Margaret S. Williams, *Repeat Players in Multidistrict Litigation: The Social Network*, 102 Cᴏʀɴᴇʟʟ L. Rᴇv. 1445, 1467–68 (2017).

13  Amanda Bronstad, *There Are New Faces Leading MDLs. And They Aren't All Men*, Lᴀᴡ. ᴄᴏᴍ (July 6, 2020, 10:53 PM), https://www.law.com/2020/07/06/there-are-new-faces-leading-mdls-and-they-arent-all-men/.

14  *See* Stanwood R. Duval Jr., *Considerations in Choosing Counsel for Multidistrict Litigation Cases and Mass Tort Cases*, 74 Lᴀ. L. Rᴇv. 391, 392–93 (2014) ("My colleagues and I often see the same attorneys appointed to all such committees. This repetition is not necessarily a good thing.").

15  *See In re Nat'l Prescription Opiate Litig.*, MDL No. 2804 (N.D. Ohio May 7, 2018) (ECF No. 383).

16  *E.g.*, N.D. Cal. Civ. R. 3-15, https://www.cand uscourts.gov/filelibrary/3/Local_Rules-Civil-eff-5-1-2018.pdf; N.D. Cal. Standing Order for All Judges, ¶ 19, https://cand.uscourts.gov/wp-content/uploads/judges/Standing_Order_All_Judges_11.1.2018.pdf.

# *JUDICATURE* IS MORE IMPORTANT THAN EVER

## That's why we're proud to support its mission to inform the administration of justice.

Osborn Maledon is a law firm based in Phoenix, Arizona, that provides litigation, business, and general counsel solutions for its clients. We provide many services to our clients, from strategic advice for our business and litigation clients, to written and oral presentations to judges, juries, and arbitrators. We are proud to support Judicature as part of our commitment to serving our community and our profession.



(602) 640-9000 • OMLAW.COM • 2929 N CENTRAL AVE, 21ST FL, • PHOENIX, AZ 85012

Copyright © by the Bolch Judicial Institute at Duke Law. Reprinted with permission.
© 2021 Duke University School of Law. All rights reserved. JUDICATURE.DUKE.EDU

17   571 U.S. 1040, 1041 (2013).

18   *Id.* at 1042.

19   *See* Christina L. Boyd, Lee Epstein & Andrew D. Martin, *Untangling the Causal Effects of Sex on Judging*, 54 Am. J. Pol. Sci. 389, 390 (2010).

20   Marie-Élène Roberge & Rolf van Dick, *Recognizing the Benefits of Diversity: When and How Does Diversity Increase Group Performance?*, 20 Hum. Res. Mgmt. Rev. 295, 297 (2010) (citing studies).

21   Scott E. Page, the Difference: How the Power of Diversity Creates Better Groups, Firms, Schools, and Societies 7–8, 302–12, 324–27 (paperback ed., 2007); Eden B. King et al., *Conflict and Cooperation in Diverse Workgroups*, 65 J. Soc. Issues 261, 267–68 (2009); Elizabeth Mannix & Margaret A. Neale, *What Differences Make a Difference?: The Promise and Reality of Diverse Teams in Organizations*, 6 Psychol. Sci. Pub. Int. 31, 41–42 (2005); Abby L. Mello & Lisa A. Delise, *Cognitive Diversity to Team Outcomes: The Roles of Cohesion and Conflict Management*, 46 Small Grp. Rsch. 204, 205–07 (2015).

22   *See* Page, *supra* note 21, at xiv–xv, 325–27.

23   Scott E. Page, Diversity and Complexity 157 (2011).

24   Pretrial Order 1, at 11–12, *In re Zantac (Ranitidine) Prods. Liab. Litig.*, No. 20-md-2924 (S.D. Fla. Feb. 14, 2020) (ECF No. 13).

25   Case Management Order 1, *In re* Elmiron (Pentosan Polysulfate Sodium) Prods. Liab. Litig., No 20-md-2973 (D. N.J. Dec. 18, 2020) (ECF No. 2), https://static.reuters.com/resources/media/editorial/20210125/elmiron--pretrialorder1.pdf.

26   John M. Levine & Hoon-Seok Choi, *Minority Influence in Interacting Groups: The Impact of Newcomers*, *in* Rebels in Groups 73, 78 (Jolanda Jetten & Matthew J. Hornsey eds., 2011).

27   *See* Michael Baylson & Cecily Harris, *Equal Opportunity? Increasing Diversity in Complex Litigation Leadership*, 101 Judicature 65 (2017) (suggesting that applications and interviews that place more power in the judge's hands can lessen "the power of the 'old boys' club'").

28   *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 643 n.4 (E.D. La. 2010).

29   Elizabeth Chamble Burch, *Monopolies in Multidistrict Litigation*, 70 Vand. L. Rev. 67, 162–65 (2017).

30   Elite insiders appear an average of 73 days after transfer. Repeat players with fewer appearances arrive after 333 days, and others appear 419 days post-transfer. Margaret S. Williams, Emery G. Lee, III & Catherine R. Borden, *Repeat Players in Multidistrict Litigation*, 5 J. Tort L. 141, 166 (2014).

31   *See* Charlan J. Nemeth & Jack A. Goncalo, *Rogues and Heroes: Finding Value in Dissent*, *in* Rebels in Groups: Dissent, Deviance, Difference, and Defiance 17, 22 (Jolanda Jetten & Matthew J. Hornsey eds., 2011); Stefan Schulz-Hardt et al., *Dissent as a Facilitator: Individual- and Group-Level Effects on Creativity and Performance*, *in* The Psychology of Conflict Management in Organizations 149, 150–54, 162–63 (Carsten K.W. De Dreu & Michele

32   J. Gelfand eds., 2008).

33   Case Management Order 3A, *In re Atrium Med. Corp. C-Qur Mesh Prods. Liab. Litig.*, No. 16-md-2753 (D.N.H. Mar. 13, 2017) (ECF. No. 40).

33   Elizabeth Chamblee Burch & Margaret S. Williams, *Judicial Adjuncts in Multidistrict Litigation*, 120 Colum. L. Rev. 2129 (2020); Judge George C. Hanks, Jr., *Searching from Within: The Role of Magistrate Judges in Federal Multi-District Litigation*, 8 Fed. Cts. L. Rev. 35, 37 (2015).

34   Burch & Williams, *supra* note 33, at 2182–85, 2205–14.

35   *Id.*

36   Status Conference at 59, *In re Vioxx*, No. 05-md-1657 (E.D. La. Sept. 3, 2010) (ECF No. 50843).

37   Report by the Claims Administrator on Potentially Fraudulent Claims Filed in the Nationwide Vioxx Consumer Settlement Program, *In re Vioxx Prods. Liab. Litig.*, No. 05-md-01657 (E.D. La. Feb. 25, 2015) (ECF No. 65169).

38   Order, *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, MDL No. 08-md-2004 (M.D. Ga. Sept. 7, 2016) (ECF No. 1039).

We are proud to support *Judicature* and its mission to create a forum for the issues and ideas shaping the judiciary and the administration of justice.

CRAVATH, SWAINE & MOORE LLP